UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the Matter of the Extradition of Yechiel Yehoshua Farkash a/k/a Yechiel Farkas | : : : : | Hon. Rukhsanah L. Singh, U.S.M.J.<br>Mag. No. 26-14012 |

**UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION**

ROBERT FRAZER
United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

SAMMI MALEK
Assistant United States Attorney

## PRELIMINARY STATEMENT

The Government of Israel has requested the extradition of Yechiel Yehoshua Farkash a/k/a Yechiel Farkas ("Farkash"), pursuant to the extradition treaty between the United States and Israel,[1] so that Farkash can face prosecution for: (1) one count of the attempted rape of victim Y.S., in violation of Section 345(a)(1) of Israel's Penal Law ("IPL"), together with IPL Section 25; (2) seventeen counts of indecent acts against victim Y.S. through abuse of authority and educational relationship, in violation of IPL Section 348(d)(1); and (3) four counts of indecent acts against a minor under the age of sixteen (namely, victim D.R.) without free consent, in violation of IPL Section 348(b) in the circumstances described in IPL Section 345(b)(1). The United States is pursuing extradition in accordance with its Treaty obligations to Israel.

By statute, this Court must consider the evidence of criminality that Israel has presented and determine whether it is "sufficient to sustain the charge[s] under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the Court finds the evidence sufficient to sustain the charges against Farkash, the Court must

[1] *See* Convention on Extradition Between the Government of the United States of America and the Government of the State of Israel, U.S.-Isr., Dec. 10, 1962, 14 U.S.T. 1707 (the "Convention"), as amended by Protocol Between the Government of the United States and the Government of the State of Israel Amending the Convention on Extradition Signed at Washington, D.C. on December 10, 1962, U.S.-Isr., July 6, 2005, S. TREATY DOC. NO. 109-3 (2005) (the "Protocol"; together with the Convention, the "Treaty"). **Exhibit 1** hereto includes the Declaration of Tom Heinemann, Attorney-Adviser, Office of the Legal Adviser for the U.S. Department of State, dated June 25, 2026 (the "Heinemann Declaration"); the Treaty; and Israel's submissions in support of extradition.

"certify the same" to the Secretary of State, who then decides whether to surrender the fugitive "according to the stipulations of the treaty or convention." *Id.*

Because the law regarding extradition is *sui generis*, differing substantially from ordinary criminal or civil proceedings, the United States offers this memorandum as a guide to the nature of the extradition hearing and the Treaty's application to the facts of this case. As detailed below, the evidence Israel has submitted fulfills the relevant Treaty requirements. The Court should therefore "certify the same" to the Secretary of State, who will then decide whether to surrender Farkash. *Id.*[2]

## STATEMENT OF FACTS

***Offense Conduct.*** According to the evidence Israel describes, victim and witness statements reflect the following:

Victim Y.S. (Indecent Acts)

Between 2020 and 2023 (the "relevant period"), victim Y.S. (born June 2006) was a student in Torat Hahayim Yeshiva (the "yeshiva"), an educational institution for ultra-Orthodox boys in Bnei Brak, Israel. Y.S. resided in Keren Hayeled boarding school (the "boarding school"). During the relevant period, Farkash acted as the pedagogical director of the yeshiva. As such, Farkash managed logistical

---

[2] After the Court completes its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual [fugitive] as well as foreign relations, which the extradition magistrate may not." *Id.*

aspects, including assigning work to the students. Additionally, Farkash was a teacher and assisted students who were having difficulties in their studies.

Farkash gave Y.S. extra attention relative to other students and summoned Y.S. to Farkash's office often. In addition, Farkash offered to buy clothing for Y.S. and gave him money for that purpose. Y.S. told Israeli authorities that Farkash was a powerful and influential person, which is why Y.S. was scared of Farkash and was dependent on him.

According to Y.S., before Y.S. turned fifteen, Farkash made efforts to normalize nudity (for example, by disrobing together before entering the *mikvah* (ritual bath)). On multiple occasions between June 2021 and October 2023, Farkash called Y.S. to his office. There, Farkash would hug Y.S., from the front or from the back. On some occasions, Farkash pressed his erect genitalia against Y.S.'s body (Indecent Acts, Count 1).

On approximately June 9, 2022, Farkash and Y.S. visited the Knesset (Israel's Parliament), in honor of Y.S.'s approaching sixteenth birthday. During the drive, Farkash touched Y.S. near his lower abdomen and his genitalia (Indecent Acts, Count 2). In an elevator at the Knesset building, Farkash hugged Y.S. and pressed his genitalia against Y.S.'s body (Indecent Acts, Count 3). Y.S. wanted to tell Farkash to stop but was scared. On the same day, after returning to the yeshiva, Farkash called Y.S. to his office, where Farkash hugged Y.S., pressed his genitalia against Y.S.'s body, touched his own genitalia, and then touched Y.S.'s genitalia over his clothes (Indecent Acts, Count 4).

At one point, Farkash stated that he would not touch Y.S. because Y.S. did not like it, but that Y.S. would "get over it." Then Farkash stated that on Thursday they would go to a "*tzimmer*" (cabin/bed and breakfast), and that Farkash would "save the love for there."

In approximately August 2022, Farkash took Y.S. to a bed and breakfast in the Jerusalem area. During the stay, Farkash played pornography on the television and partially undressed Y.S. Y.S. told Farkash that he did not want this, that he felt terrible, and that Farkash "took his soul." Farkash and Y.S. then entered the hot tub in their underwear. While the jacuzzi filled, Farkash seated Y.S. on his lap, hugged Y.S., soaped Y.S.'s body, and touched Y.S.'s genitalia under his underwear (Indecent Acts, Count 5). Farkash placed Y.S.'s head on Farkash's genitalia. Next, Farkash pressed his genitalia against Y.S.'s buttocks and between his legs, trying to achieve sexual release. Farkash kissed Y.S. and touched his buttocks under his underwear. Y.S. resisted. Farkash stated that next time would be easier. Farkash grabbed Y.S.'s head and kissed him on the mouth (Indecent Acts, Count 6). While Y.S. showered, Farkash followed Y.S. into the shower and kissed him (Indecent Acts, Count 7).

In approximately September 2022, Farkash, Y.S., and another minor went to a water park in Holon, Israel. There, Farkash entered a hot tub with Y.S. and touched Y.S.'s genitalia (Indecent Acts, Count 8).

In approximately October 2022, Farkash invited Y.S. to sleep over in an apartment that Farkash rented near his home in Rehovot, Israel. On at least four

occasions over several weekends, Farkash touched Y.S.'s genitalia, over and under Y.S.'s clothes (Indecent Acts, Counts 9-12).

Also during the relevant period, Farkash took Y.S. out to eat. On the drive back to the yeshiva, while Y.S. was eating, Farkash touched Y.S.'s body (Indecent Acts, Count 13).

On an unspecified date, in or around 2023, Farkash rented a room for himself and Y.S. During their stay, Farkash instructed Y.S to sit on Farkash's lap in the jacuzzi, telling Y.S. not to be "ungrateful." Y.S. complied. Later, while both were on the bed, Farkash inserted his penis through Y.S.'s boxer briefs, rubbed it against Y.S.'s buttocks, and attempted to penetrate Y.S.'s anus. Y.S. resisted. This angered Farkash, who grabbed and shook Y.S. and repeatedly attempted to penetrate Y.S.'s anus. Farkash changed their body positions periodically and made persistent attempts to achieve anal penetration (Attempted Rape). Y.S. told Israeli authorities that he felt physical pain from being held. At some point during the incident, Farkash, while wearing boxer briefs, pressed his penis against Y.S.'s mouth, and subsequently placed Y.S.'s hand on Farkash's penis. Farkash also asked Y.S. to remove his underwear so that Farkash could see his genitals, and Y.S. complied (Indecent Acts, Count 14). Y.S. recalled Farkash calling him "garbage" and "ungrateful" and saying that Y.S. "didn't go with the flow." On the way back to the vehicle, Farkash hugged and kissed Y.S. During the drive, Farkash touched Y.S., and eventually stopped the vehicle to continue touching Y.S., inserting his hand

into Y.S.'s underwear, touching Y.S.'s buttocks, and kissing Y.S. on the mouth (Indecent Acts, Count 15).

On approximately June 9, 2023, Farkash told Y.S. that he intended to celebrate Y.S.'s seventeenth birthday. Subsequently, Farkash rented a room in the Bnei Brak area, where Farkash, Y.S., and another minor arrived. In the room, Farkash and the other minor changed into bathing suits, while Y.S. removed his clothing and remained in boxer briefs. Farkash had promised Y.S. a swimsuit but did not provide one. Farkash screened a pornographic film on the television, and later touched Y.S.'s body and genitals over his clothing. Farkash then returned Y.S. to the boarding school, hugged him, and left (Indecent Acts, Count 16).

On a later date not precisely known, Y.S.'s counselor at the boarding school asked Y.S. to purchase a cake for the counselor's wife's birthday. Farkash agreed to drive Y.S. to get the cake. During the drive, Farkash grabbed Y.S. by the jaw, kissed Y.S. on the mouth, and touched Y.S.'s genitals over his clothing (Indecent Acts, Count 17).

Y.S. also recalled an incident at the Dead Sea when Farkash touched Y.S. under his clothes, in the presence of Farkash's 12-13-year-old son.

Y.S. confided in Binyamin Buskila ("Buskila"), a counselor at the boarding school, about Farkash's actions. According to Buskila, he previously was aware that Y.S. and Farkash were close, and that Farkash frequently made seemingly innocent requests for Y.S.'s time, such as going out to eat, helping move furniture, or staying out after school. Y.S. told Buskila that Farkash had "burned his soul." Y.S.

described incidents involving bed and breakfasts, Farkash lying on top of Y.S., touching and performing oral sex on him. Y.S. also recounted a forced kiss with tongue, where Farkash reacted with anger and accusations of ungratefulness when Y.S. resisted. Additionally, Y.S. described that Farkash had attempted anal penetration on him, and Y.S. mentioned that Farkash had victimized others.

According to Y.S., Farkash stopped the abuse only when Farkash realized there was an attempt to open a case against him. Farkash continued calling Y.S. several times a week to ensure "business as usual."

Email communications between Farkash and Y.S. between October 2022 and August 2024 include messages such as "go to sleep sweetheart," "I love you very very very much," "I'm crazy about you," "missing you terribly," and "I really miss you." In one of the emails, Farkash attached a picture of the beds in an apartment where he stayed on weekends with Y.S.

_Victim D.R._

During the relevant period, victim D.R (born April 2008) was a student in the yeshiva. According to D.R., on an unspecified date in December 2022, after other students talked about D.R.'s sweater, Farkash offered to purchase a new sweater for D.R. Although D.R. expressed reservations, Farkash insisted and forcibly took D.R. into his car, which made D.R. uncomfortable. They drove from the yeshiva to a shopping center. Farkash drove the vehicle, while another minor sat in the front passenger seat and D.R. sat in the center of the rear seat. During the drive,

Farkash reached out and stroked D.R.'s leg and moved up to D.R.'s groin, repeatedly telling D.R that he loved him (Indecent Acts, Count 1).

At the shopping center, Farkash asked D.R. to select a sweater for Farkash to purchase. D.R. stated that he did not find a sweater he liked in the store. Farkash approached D.R., stroked his neck, told him he loved him, and insisted on finding a sweater that would please D.R. (Indecent Acts, Count 2). When D.R. stated that he did not like any, Farkash raised his voice and stated that D.R. would not leave until he had a sweater. Subsequently, Farkash and D.R. went to additional stores in the shopping center. While walking between stores, Farkash stroked D.R.'s neck and placed his hand on D.R.'s abdomen. D.R removed Farkash's hand and stated that these actions were unpleasant to him (Indecent Acts, Count 3). Farkash continued touching D.R. more gently.

Thereafter, Farkash took D.R. out to eat. On their way back, Farkash continued to place his hand on D.R.'s body (Indecent Acts, Count 4). That night, D.R. told his mother about Farkash's actions. D.R.'s mother told D.R. that Farkash's behavior was inappropriate and instructed D.R. not to go near Farkash again. After speaking with his mother, D.R. told Farkash not to approach him anymore and that he did not want to speak with him. D.R. also reported the incidents to a rabbi from the yeshiva, who further reported what D.R. had told him.

Rabbi Refael Moshe Alaluf ("Alaluf") was the director of special education at the yeshiva. According to Alaluf, after Y.S.'s counselor made a report about Farkash's behavior, Farkash did not come to work, stating that he was on his way

to a lawyer. Farkash also wrote an email stating that he only indulges the students to strengthen them in their studies, and that he understood he had made a mistake. Farkash also claimed there was an attempt to frame him. In one email, Farkash asked Alaluf to communicate with Farkash's lawyer, while instructing Alaluf to delete these emails and use a separate phone number for sensitive communications.

Farkash departed Israel on January 4, 2024 – shortly after the investigation commenced.

First Sergeant Major Yaakov Meir ("Meir"), Israel Police, has identified a photograph as depicting Farkash. Meir states that in capacity as a resident of Bnei Brak, he is familiar with the yeshiva, Farkash's position at the yeshiva, and Farkash's appearance.

***Procedural History.*** On December 10, 2025, Judge Zippora Giloni-Gez of the Tel Aviv-Yafo Magistrate's Court signed a warrant to arrest Farkash for the offenses underlying the extradition request. That warrant remains valid and enforceable. On April 14, 2026, in response to a request from the Government of Israel, the United States filed a Complaint seeking the provisional arrest of Farkash with a view toward extradition, pursuant to the Treaty and 18 U.S.C. §§ 3184 *et seq*. (*See* Dkt. No. 1 ("Compl.")). On April 17, 2026, Farkash was provisionally arrested in this District and made an initial appearance before the Court. He has since been in the custody of the United States Marshals Service. The Government of Israel made a formal extradition request for Farkash, via the diplomatic channel, on June 1, 2026, which it supplemented on June 18, 2026.

## ARGUMENT

### I. GENERAL PRINCIPLES OF INTERNATIONAL EXTRADITION

The extradition process is *sui generis*, meaning it is neither a criminal nor a civil proceeding. Extradition is primarily an executive function with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge" (*i.e.*, whether there is probable cause). 18 U.S.C. §§ 3184, 3186; *Martin*, 993 F.2d at 828; *Lo Duca v. United States*, 93 F.3d 1100, 1110 n.10 (2d Cir. 1996). The Secretary of State, and not the Court, makes the ultimate decision whether a fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs."). The extradition judge is assigned the limited duty of determining the request's sufficiency under the applicable treaty provisions. *Martin*, 993 F.2d at 82-29.[3] That judicial function is carried out by conducting a hearing pursuant to 18 U.S.C. § 3184. "This bifurcated

[3] "[T]he function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is 'competent legal evidence which … would justify his apprehension and commitment for trial if the crime had been committed in that state.'" *Shapiro* v. *Ferrandina*, 478 F.2d 894, 900-91 (2d Cir. 1973) (quoting *Collins* v. *Loisel*, 259 U.S. 309, 315 (1922)); *see also Prasoprat* v. *Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005) (finding that the court's inquiry is limited to "whether the crime is extraditable and whether there is probable cause to support the charge" and that "the judicial officer *must* certify the individual as extraditable to the Secretary of State" if those requirements are met) (emphasis in original).

procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification—as defined in the Treaty, statutes, and case law—have been established. *See Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 815 (S.D. Tex. 2011). If the fugitive offers any explanatory evidence, the court should rule on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification. *Shapiro v. Ferrandina*, 478 F.2d 894, 905-06 (2d Cir. 1973), *cert. dismissed*, 414 U.S. 884 (1973). If the Court finds that the requirements for certification have been met, it "shall" furnish the certification to the Secretary of State (together with a copy of the evidence and a transcript of any testimony presented at the hearing) and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see Sidali v. I.N.S.*, 107 F.3d 191, 195 (3d Cir. 1997); *Ordinola v. Hackman*, 478 F.3d 588, 597 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007).

In fulfilling its function under Section 3184, the Court should construe liberally the applicable extradition treaty to effect its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."); *In re Extradition of Aquino*, 697 F. Supp. 2d 586, 590 (D.N.J. 2010) ("In construing such treaties, form is not to be insisted upon beyond the requirements of safety and justice.") (citations omitted); *McElvy v. Civiletti*, 523 F. Supp. 42, 47 (S.D. Fla. 1981); *In re Extradition of Nezirovic*, Civ. No. 7:12MC39, 2013 WL 5202420, at *5 (W.D. Va. Sept. 16, 2013) ("Treaties are construed liberally to favor the obligation to surrender fugitives.") (citation omitted). As the Supreme Court explained in *Factor*:

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them.

290 U.S. at 293. To carry out a treaty obligation, the treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Id.* at 298. This country does not expect foreign governments to be versed in our criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184 (1902).

Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

The Court should afford great weight to statements by the U.S. Department of State regarding treaty interpretation. *See El Al Isr. Airlines v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Ahmad v. Wigen*, 726 F. Supp. 389, 402 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ("The State Department's view deserves deference, unless it represents a substantial departure from national or international norms.").

Similarly, a United States extradition court "is not entitled to second guess [the requesting country]'s compliance with its own laws." *Jean v. Mattos*, Civ. No. 13-5346 (KSH), 2014 WL 885058, at *4 (D.N.J. Mar. 5, 2014) (citation omitted).

## II. ISRAEL'S EXTRADITION REQUEST SATISFIES THE REQUIREMENTS FOR CERTIFICATION.

An extradition certification is in order where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the treaty covers the crimes for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to each charge for which extradition is sought. 18 U.S.C. § 3184; *Fernandez*, 268 U.S. at 312; *Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006); *Sidali*, 107 F.3d at 195.

### A. The Court Has Authority Over the Proceedings.

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). In this District, both magistrate judges and district judges may render a certification under Section 3184. *See* Local Cr. R. 5.1(k) (expressly authorizing magistrate judges to conduct extradition proceedings in accordance with 18 U.S.C. § 3184); *Hoxha*, 465 F.3d at 556 (affirming magistrate judge's finding that fugitive was extraditable).

### B. The Court Has Jurisdiction Over Farkash.

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (establishing that magistrate judge "may, upon complaint made under oath, charging any person found within his jurisdiction, … issue his warrant for the apprehension of the person so charged"); *see Pettit v. Walshe*, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found."); *In re Extradition of Pazienza*, 619 F. Supp. 611, 616 (S.D.N.Y. 1985). This Court has personal jurisdiction over Farkash, as he was located and arrested in this District.

### C. The Treaty Is In Full Force And Effect.

The extradition statute, 18 U.S.C. § 3184, provides for extradition where a treaty or convention is in force between the requesting state and the United States. *See, e.g.*, *Hoxha*, 465 F.3d at 562-63; *United States ex rel Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997).

Here, the Government has provided the Heinemann Declaration, attesting that the Treaty is in full force and effect. (*See* Heinemann Declaration ¶ 2.) The Department of State's determination is entitled to deference from the Court. *See Charlton*, 229 U.S. at 468; *Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Hoxha*, 465 F.3d at 562 ("Whether a treaty remains valid following a change in the status of one of the signatories is a political question, and we therefore defer to the views of each nation's executive branch."). The Court should therefore defer to the Department of State in this regard.

### D. The Treaty Covers the Crimes for which Israel Seeks Farkash's Extradition.

Here, the Treaty provides, in relevant part, for the extradition of "persons … who have been charged with … any of the offenses mentioned in Article II." Treaty, art. I. Article II, in turn, provides that an offense "shall be extraditable if it is punishable under the laws in both Parties by deprivation of liberty for a period of one year or by a more severe penalty." *Id.*, art. II.[4]

---

[4] Additionally, an offense shall be extraditable regardless of "whether or not the laws in the Requesting and Requested Parties place the offense within the same category of offenses or describe the offense by the same terminology." Treaty, art II(3). "[I]t is understood that with regard to offenses under the federal law of the United States, which require a showing of such matters as interstate transportation, or use … of other facilities affecting interstate or foreign commerce, such

Accordingly, the Court must determine whether the conduct underlying the extradition request is also a crime in the United States, a requirement known as dual criminality. Dual criminality exists if the conduct underlying the foreign offense would be criminal under U.S. federal law, the law of the state in which the extradition hearing is held (here, New Jersey), or the law of a preponderance of the states. *Hu Yau-Leung* v. *Soscia*, 649 F.2d 914, 918 n.4 (2d Cir. 1981); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107-08 (9th Cir. 1981); *In re Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989); *Quintanilla v. United States*, 582 F. App'x 412, 414 (5th Cir. 2014). Notably, the foreign offense need not be identical to ours. In *Collins v. Loisel*, the Supreme Court held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. 259 U.S. 309, 312 (1922); *see United States v. Riviere*, 924 F.2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours.").

Dual criminality exists in this case. *First*, Israel's submissions explain that the Israeli offense of attempted rape carries a potential penalty of sixteen years imprisonment and includes an attempt to penetrate another person's body without their consent. Farkash's conduct underlying the charge for attempted rape, had he

---

matters are merely for the purpose of establishing jurisdiction," and their absence "in the definition of the offense according to Israeli law shall not affect the determination of dual criminality." *Id.* Further, "If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request, even if the latter offense is punishable by deprivation of liberty for a period of less than one year … ." *Id.*, art. II(4).

committed the activity in the United States, would be criminal under multiple statutes, including 18 U.S.C. § 2241(a)(1) (attempted aggravated sexual abuse, which carries a potential penalty of life imprisonment); 18 U.S.C. § 2242(3) (attempted sexual abuse, which carries a potential penalty of life imprisonment); and/or N.J. Stat. § 2C:14-2(c)(1) or (c)(3)(b) (attempted sexual assault, a second-degree offense, which carries a potential penalty of ten years imprisonment pursuant to N.J. Stat. §§ 2C:43-6(a)(2) and 2C:5-4).

*Second*, Israel's submissions explain that the offense of indecent acts through abuse of authority and educational relationship, in violation of IPL Section 348(d)(1), together with IPL Section 25, carries a potential penalty of four years imprisonment, and includes any act for the purpose of sexual arousal, satisfaction, or abasement, against a minor who has reached the age of 14, by exploiting relations of dependency, authority, education, supervision, work, or service. Farkash's conduct underlying all seventeen counts of this offense, had the activity occurred in the United States, would be criminal under multiple statutes, including N.J. Stat. § 2C:24-4(a)[5] (endangering welfare of children, a second-degree offense,[6]

---

[5] N.J. Stat. § 2C:24-4(a)(1) provides:

> Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree. Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.

[6] As the court explained in *State v. McInerney*,

> [U]nder appropriate circumstances, a person who has assumed responsibility for the care of a child may include a teacher, employee, volunteer, whether compensated or uncompensated,

which carries a potential penalty of ten years imprisonment pursuant to N.J. Stat. § 2C:43-6(a)(2)); 18 U.S.C. 113(a)(2) (assault with intent to commit a felony, which carries a potential penalty of ten years imprisonment); and/or 18 U.S.C. § 113(a)(5) (simple assault, which carries a potential penalty of one year imprisonment where the victim is younger than sixteen, and six months imprisonment when the victim has reached age sixteen).[7]

Additional statutes also apply. For example, Counts 1-4, which occurred when Y.S. was younger than sixteen, also would be criminal under 18 U.S.C. § 2244(a)(5) (abusive sexual contact, which carries a potential penalty of life imprisonment); and/or N.J. Stat. § 2C:14-3(a) (aggravated criminal sexual contact, a third degree offense that carries a potential penalty of five years imprisonment pursuant to N.J. Stat. § 2C:43-6(a)(3)). Counts 5-6, 8-12, and 14-17 also would be criminal under 18 U.S.C. § 2244(a)(2) (abusive sexual contact, which carries a potential penalty of three years imprisonment); and/or N.J. Stat. § 2C:14-3(b)

---

> of an institution who is responsible for the child's welfare, and a person who legally or voluntarily assumes the care, custody, maintenance, or support of the child. It can also include any staff person of an institution regardless of whether or not the person is responsible for the care or supervision of the child, as well as teaching staff members or other employees, whether compensated or uncompensated of a day school. However, it includes only those who assume a general and ongoing responsibility for the child and who ha[ve] established a continuing and [a] regular supervision or caretaking relationship with the child. It does not include one who only assumes a temporary, brief, or occasional caretaking function.

428 N.J. Super. 432, 444–45, 54 A.3d 281, 289 (App. Div. 2012).

[7] *See* Treaty, art. II(4).

(criminal sexual contact, a fourth degree offense that carries a potential penalty of 18 months imprisonment pursuant to N.J. Stat. § 2C:43-6(a)(4)).

*Third*, Israel's submissions explain that the offense of indecent acts against a minor under the age of sixteen without free consent, in violation of IPL Section 348(b) in the circumstances described in IPL Section 345(b)(1), carries a potential penalty of ten years imprisonment and includes any act for the purpose of sexual arousal, satisfaction, or abasement, upon a minor under the age of sixteen, without their consent. Farkash's conduct underlying all four counts of this offense, had the activity occurred in the United States, would be criminal under multiple statutes, including N.J. Stat. § 2C:24-4(a)(1) (endangering welfare of children, a third-degree offense, which carries a potential penalty of five years imprisonment pursuant to N.J. Stat. § 2C:43-6(a)(3)); 18 U.S.C. § 113(a)(2) (assault with intent to commit a felony, which carries a potential penalty of ten years imprisonment); and/or 18 U.S.C. § 113(a)(5) (simple assault, which carries a potential penalty of one year imprisonment where the victim is younger than sixteen). Additional statutes also apply. For example, Count 1 also would be criminal under 18 U.S.C. § 2244(a)(5) (abusive sexual contact, which carries a potential penalty of life imprisonment); and/or N.J. Stat. § 2C:14-3(a) (aggravated criminal sexual contact, a third degree offense that carries a potential penalty of five years imprisonment pursuant to N.J. Stat. § 2C:43-6(a)(3)).

Accordingly, the dual criminality requirement is satisfied, and the Treaty covers all the offenses for which Israel seeks to extradite Farkash.

**E. Probable Cause Exists to Believe that Farkash Committed the Offenses For Which Israel Seeks Extradition.**

The standard of proof to find the evidence "sufficient to sustain the charge" pursuant to 18 U.S.C. § 3184 is the familiar domestic requirement of probable cause. The Court must conclude that probable cause exists to believe that the crime Israel alleges was committed, and that the person before the Court committed them. *See Hoxha*, 465 F.3d at 561 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.). "Section 3184 requires the extradition court to conduct essentially the same preliminary inquiry typically required for issuance of a search warrant or an arrest warrant." *Haxhiaj v. Hackman*, 528 F.3d 282, 287 (4th Cir. 2008). "This is a relatively modest standard that requires the Court consider 'the totality of the circumstances' involved." *In re Extradition of Jean*, Mag. No. 13-3588 (MF), 2013 WL 4502102, at *3 (D.N.J. Aug. 22, 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The evidence is sufficient, and probable cause exists, if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). As the Supreme Court stated in *Benson v. McMahon*:

> [T]he proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by

> imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.

127 U.S. 457, 463 (1888); *see also Fernandez*, 268 U.S. at 312 ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict."); *Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *accord Ordinola*, 478 F.3d at 608 ("It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing … . That is the task of the … courts of the other country.").

In February 2020, a court in this District examined a case in which Poland sought to extradite a fugitive for the crime of rape. *See In re Extradition of Czerech*, Mag. No. 19-6763, 2020 WL 603998 (D.N.J. Feb. 6, 2020). Magistrate Judge Falk, citing *Collins*, emphasized that "this Court's function is only to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Id.*, at *5. The requesting country is "not required to present its entire case in this country, nor is it appropriate for this Court to assess whether the evidence presented is sufficient to justify a conviction." *Id.* The court found that, considering the totality of the circumstances and the unique rules of wide latitude that govern the receipt of evidence in extradition hearings, the government had established probable cause to

sustain the charge; as a result, the court certified extradition for the Secretary of State's further consideration. *See id.* at *5-6.

In this case, Israel's extradition request more than establishes probable cause to believe that Farkash committed the offenses underlying the extradition request. Israel submitted documents including (1) the affidavit of Rosi Kabz, a senior prosecutor in the Office of the Tel-Aviv District Attorney, discussing the relevant statutes and describing the evidence against Farkash, including witness statements (from the victims, Buksila, and Alaluf) and written communications from Farkash; and (2) Meir's affidavit identifying a photo as depicting Farkash. Based on this evidence, the extradition request amply satisfies the probable cause requirement.

## III. EXTRADITION IS *SUI GENERIS* AND FOLLOWS UNIQUE PROCEDURES.

### A. An Extradition Hearing Is Not A Criminal Proceeding.

As stated above, an extradition hearing is not a criminal proceeding. Its purpose is to decide the sufficiency of the charge under the treaty, not to determine the guilt or innocence of the accused; that is for the foreign court. *See, e.g.*, *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Benson*, 127 U.S. at 463. Accordingly, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include … the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to … miscellaneous proceedings such as extradition or rendition."); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). Rather,

"unique rules of wide latitude govern reception of evidence" in extradition hearings. *Sayne* v. *Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted).

Among those rules is that the rights available to a defendant in a criminal trial do not attach to a fugitive in international extradition proceedings. *See Neely*, 180 U.S. at 122 (rights available to one charged with criminal offense in this country not applicable to offenses committed outside the United States against the laws of another country); *accord Charlton*, 229 U.S. at 461; *Martin*, 993 F.2d at 829. Moreover, the fugitive has no right to discovery. *See Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005), *cert. denied*, 546 U.S. 1171 (2006); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984). The fugitive's right to present evidence is severely constrained, and his Constitutional rights are limited. For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing or confront his accusers, *see Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Ordinola*, 478 F.3d at 608; and no Sixth Amendment right to a speedy extradition, *see McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Martin*, 993 F.2d at 829; *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978). The exclusionary rule is inapplicable, *see Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see Collins v. Loisel*, 262 U.S. 426, 429 (1923); *In re Extradition of McMullen*, 989 F.2d 603, 612–13 (2d Cir. 1993), *cert. denied*, 510 U.S. 913 (1993).

### B. Extradition Hearings Rely On Written Submissions And Do Not Require Live Witnesses.

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986). Thus, hearsay evidence is admissible at extradition hearings and may fully support a finding of extraditability. *See Bingham*, 241 U.S. at 517 (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he lacked the opportunity to cross-examine those witnesses); *Collins*, 259 U.S. at 317; *Hoxha*, 465 F.3d at 561 ("A judge may rely on hearsay evidence in considering whether probable cause is satisfied."); *Haxhiaj*, 528 F.3d at 292 ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination.") (citations omitted); *O'Brien v. Rozman, 554 F.2d* 780, 783 (6th Cir. 1977) (citing cases); *Garcia*, 825 F. Supp. 2d at 830 ("[E]xtradition may be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting *Collins*, 259 U.S. at 317).

Indeed, a certification of extradition may be (and typically is) based entirely on the authenticated documentary evidence and information that the government seeking extradition has provided. *See, e.g., Bovio v. United States,* 989 F.2d 255, 259-61 (7th Cir. 1993) (finding Swedish investigator's statement sufficient to establish probable cause); *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977);

*Shapiro*, 478 F.2d at 902-03; *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 (S.D. Cal. 1997) (finding statements of co-conspirators and other witnesses sufficient in extradition to Mexico); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-1434 (S.D. Fla. 1993) (finding documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994). The finding also may rest upon written statements from a foreign prosecutor or judge summarizing the evidence. *Rice v. Ames*, 180 U.S. 371, 375-76 (1901); *Jean*, 2014 WL 885058, at *5 ("That some evidence is 'alluded to' rather than 'reproduced" – for example, the police reports from which witness statements were presumably extracted are not in the record – does not diminish the validity of what is satisfactorily described.").

Moreover, the material in Israel's extradition submissions should be taken as true. *See, e.g.*, *In re Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005); *In re Lukes*, No. 2:02-MC-23-FTM, 2003 WL 23892681, at *4 n.6 (M.D. Fla. May 8, 2003); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (stating that the court "'must accept as true all of the statements and offers of proof by the demanding state,' even if they contain hearsay.") (quoting *In re Extradition of Marzook*, 924 F. Supp. 565, 592 (2d Cir. 1996) (alteration omitted)); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); *Ahmad*, 726 F. Supp. at 399-400; *In re Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989) ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination.") (citing *Collins*, 259 U.S. at 315-16). Credibility determinations are

reserved for the foreign court. *See Santos v. Thomas*, 830 F.3d 1002-03 (9th Cir. 2016) (*en banc*) (defense evidence that poses a "conflict of credibility" is inadmissible contradictory evidence); *Bovio*, 989 F.2d at 259; *In re Extradition of Singh*, 124 F.R.D. 571, 573 (D.N.J. 1987).

Here the Treaty governs the authentication and admissibility of documents introduced at an extradition hearing. Article X *bis* provides, as relevant here, that documents that bear the seal of Israel's Ministry of Justice, or that are "certified or authenticated in any other manner acceptable by the laws of the Requested Party[,] … shall be admissible as evidence in extradition proceedings … . " Treaty, art. X *bis*(1). Israel, in submitting documents in this case that bear the seal of the Ministry of Justice, has complied with the Treaty with respect to authentication and admissibility. (*See* Heinemann Decl. ¶ 6.)

### C. The Fugitive's Opportunity to Challenge the Evidence Is Very Limited.

Due to the nature and limited purpose of an extradition hearing, a fugitive's opportunity to challenge the evidence introduced against him is very limited. A fugitive may only submit evidence that explains rather than contradicts the demanding country's proof. *See Charlton*, 229 U.S. at 457-58; *Hoxha*, 465 F.3d at 561 ("Courts have traditionally distinguished between inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause."); *Ordinola*, 478

F.3d at 608.[8] The Supreme Court in *Collins* quoted with approval a district court's reasoning for the limited scope of extradition hearings:

> If this were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties.

259 U.S. 309 at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The Court of Appeals has recognized that "[i]n practice, this line is not easily drawn," but noted that "the rule serves the useful purpose of … preventing the extradition proceedings from becoming a dress rehearsal trial." *Hoxha*, 465 F.3d at 561 (citation and internal quotation marks omitted).

Consistent with these principles, courts routinely reject technical and affirmative defenses in extradition proceedings. *See Bingham*, 241 U.S. at 517

[8] The extent to which a fugitive may offer explanatory proof is largely within the court's discretion. *See Koskotas*, 931 F.2d at 175 (1st Cir. 1991); *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978); *Singh*, 124 F.R.D. at 572-73 (citing cases); *United States ex rel Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), *cert. denied*, 376 U.S. 952 (1964) (citing cases).

(rejecting objections that "savor of technicality"); *Charlton*, 229 U.S. at 462; *Collins*, 259 U.S. at 316-17; *Glucksman* v. *Henkel*, 221 U.S. 508, 513-14 (1911) (variance between charges pending in the foreign country and the complaint filed in federal court is not a valid defense to surrender); *Hooker*, 573 F.2d at 1368; *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1112 (7th Cir. 1997), *cert. denied*, 525 U.S. 810 (1998). A fugitive may not introduce evidence that (1) merely conflicts with the evidence the demanding country has submitted, *see Collins*, 259 U.S. at 315-317; *Hoxha*, 465 F.3d at 561; (2) attempts to establish an alibi, *Shapiro*, 478 F.2d at 901; (3) suggests an insanity defense, *see Charlton*, 229 U.S. at 462; or (4) seeks to impeach the credibility of the requesting country's witnesses, *see Bovio*, 989 F.2d at 259; *Singh*, 124 F.R.D. at 573 ("*While the accused may produce evidence to explain matters, the court may exclude evidence which merely contradicts government testimony, poses conflicts of credibility or establishes a defense.*") (emphasis in original) (citations omitted). Such matters, which require factual and credibility determinations, are for resolution at a trial. *See Soares v. Hendricks*, Civ. No. 11-7134 (JLL), 2012 WL 161747, at *3 (D.N.J. Jan. 19, 2012) ("[R]eviewing the entirety of the evidence is a task reserved to the [demanding country's] Courts."). In other words, the Court may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn* v. *Robinson*, 783 F.2d 776, 815 (9th Cir. 1986). Here, the evidence submitted by Israel is more than ample to support a certification of extraditability.

### D. Rule of Non-Inquiry: the Executive Branch Considers Matters Other Than Sufficiency of the Evidence.

Other than the sufficiency of the evidence, all matters that a fugitive may raise as defenses to extradition are to be considered by the Secretary of State. *See* 18 U.S.C. §§ 3184, 3186; *Hoxha*, 465 F.3d at 562-63. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali*, 107 F.3d at 195 n.7. The Secretary considers humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Escobedo*, 623 F.2d at 1105; *Hoxha*, 465 F.3d at 563 ("Under the traditional doctrine of 'non-inquiry,' [] humanitarian considerations are within the purview of the executive branch and generally should not be addressed by the courts in deciding whether a petitioner is extraditable."). This is consistent with the long-held understanding that deciding whether to surrender a fugitive to a foreign government is "purely a national act … performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *In re Kaine*, 55 U.S. 103, 110 (1852).

Similarly, a fugitive's contention that the extradition request is politically motivated or that the requesting country's justice system is unfair should be addressed by the Secretary of State, not the Court. *See Koskotas*, 931 F.2d at 173-74 (noting that demanding country's motives are for executive branch to consider); *Kin-Hong*, 110 F.3d at 110 ("It is not that questions about what awaits the relator in the

requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed"); *id.* at 109-10 (noting that the Secretary of State may "decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations," and "may also elect to use diplomatic methods to obtain fair treatment for the relator").

**CONCLUSION**

For the reasons set forth above, the Government respectfully requests the certification of Farkash's extraditability to Israel for all the offenses for which Israel seeks extradition.

Respectfully submitted,

ROBERT FRAZER
United States Attorney

By: Sammi Malek
Assistant U.S. Attorney

Dated: August 6, 2026
Newark, New Jersey

cc: Benjamin West, Esq. (via ECF and email)