# EXHIBIT 1

DECLARATION OF TOM HEINEMANN

I, Tom Heinemann declare and say as follows:

1. I am an Attorney Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Yechiel Yehoshua Farkash. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Israel are found in the Extradition Treaty between the United States of America and the Convention on Extradition Between the Government of the United States of America and the Government of the State of Israel, signed at Washington on December 10, 1962 ("Convention"), and the Protocol Between the Government of the United States and the Government of the State of Israel Amending the Convention on Extradition, signed at Jerusalem on July 6, 2005, which entered into force on January 10, 2007 ("Protocol") (both referred to as the "Treaty"). A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the Embassy of Israel has submitted a diplomatic note, dated June 1, 2026, formally requesting the extradition of Yechiel Yehoshua Farkash, and a diplomatic note, dated July 18, 2026, supplementing this request. Copies of the diplomatic notes are attached to this declaration.

4. In accordance with Article XVIII *bis* of the Treaty, the Government of the United States of America provides legal representation in the U.S. courts for the Government of Israel in its extradition requests, and the Government of Israel provides legal representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are covered by Article II of the Treaty.

6. The documents submitted by the Embassy of Israel in support of its extradition request bear the seal of the Ministry of Justice. The documents submitted by the Embassy of Israel, therefore, comply with the Treaty.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 2th, 2026.

TOM HEINEMANN

Attachments:

1. Copies of Notes

2. Copy of Treaty

**Embassy of Israel to the United States**
Washington DC

**שגרירות ישראל בארה"ב**
וושינגטון די.סי.

The Embassy of the State of Israel presents its compliments to the Department of State, and on behalf of the State of Israel, herby transmits the request of the extradition of Israeli national **Yechiel Yehoshua Farkash**, pursuant to the extradition treaty between the United States and the State of Israel.
The Embassy hereby encloses the document, together with its English translation, to be filed with the court ruling on this extradition request.
The Embassy of the State of Israel avails itself of this opportunity to renew to the Department of State the assurance of its highest consideration.

June 1, 2026

The Embassy of Israel

Embassy of Israel
3514 International Drive, NW
Washington, D.C. 20008

**Embassy of Israel to the United States**
Washington DC

**שגרירות ישראל בארה"ב**
וושינגטון די.סי.

The Embassy of the State of Israel presents its compliments to the United States State Department and has the honor to refer to the extradition request in the matter of **Yechiel Farkash.**
In this regard, the Embassy has the honor to transmit supplementary documents provided by the competent authorities of the State of Israel in support of the above-mentioned extradition request.

The Embassy would be grateful if the enclosed documents could be forwarded to the competent authorities for their consideration.

The Embassy of the State of Israel avails itself of this opportunity to renew to the United States State Department the assurances of its highest consideration.

June 18, 2026
The Embassy of Israel

שגרירות ישראל וושינגטון
EMBASSY OF ISRAEL WASHINGTON

## No. 7038

# ISRAEL
# and
# UNITED STATES OF AMERICA

**Convention on extradition. Signed at Washington, on 10 December 1962**

*Official texts: Hebrew and English.*

*Registered by Israel on 2 January 1964.*

---

# ISRAËL
# et
# ÉTATS-UNIS D'AMÉRIQUE

**Convention d'extradition. Signée à Washington, le 10 décembre 1962**

*Textes officiels hébreu et anglais.*

*Enregistrée par Israël le 2 janvier 1964.*

## No. 7038. CONVENTION[1] ON EXTRADITION BETWEEN THE GOVERNMENT OF THE STATE OF ISRAEL AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA. SIGNED AT WASHINGTON, ON 10 DECEMBER 1962

The Government of the State of Israel and the Government of the United States of America, desiring to make more effective the cooperation of the two countries in the repression of crime, agree as follows :

### *Article I*

Each Contracting Party agrees, under the conditions and circumstances established by the present Convention, reciprocally to deliver up persons found in its territory who have been charged with or convicted of any of the offenses mentioned in Article II of the present Convention committed within the territorial jurisdiction of the other, or outside thereof under the conditions specified in Article III of the present Convention.

### *Article II*

Persons shall be delivered up according to the provisions of the present Convention for prosecution when they have been charged with, or to undergo sentence when they have been convicted of, any of the following offenses :

1. Murder.
2. Manslaughter.
3. Malicious wounding; inflicting grievous bodily harm.
4. Rape.
5. Abortion.
6. Unlawful carnal knowledge of a girl under the age specified by the laws of both the requesting and requested Parties.
7. Procuration.
8. Willful non-support or willful abandonment of a minor or other dependent person when the life of that minor or that dependent person is or is likely to be injured or endangered.
9. Kidknapping; abduction; false imprisonment.

[1] Came into force on 5 December 1963, upon the exchange of the instruments of ratification at Jerusalem, in accordance with the provisions of article XIX.

10. Robbery.

11. Burglary; housebreaking.

12. Larceny.

13. Embezzlement.

14. Obtaining money, valuable securities or goods by false pretenses or by threats or force.

15. Bribery.

16. Extortion.

17. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

18. Fraud by a bailee, banker, agent, factor, trustee, executor, administrator or by a director or officer of any company.

19. Forgery, including forgery of banknotes, or uttering what is forged.

20. The forgery or false making of official documents or public records of the government or public authority or the uttering or fraudulent use of the same.

21. The making or the utterance, circulation or fraudulent use of counterfeit money or counterfeit seals, stamps, dies and marks of the government or public authority.

22. Knowingly and without lawful authority making or having in possession any instrument, tool, or machine adapted and intended for the counterfeiting of money, whether coin or paper.

23. Perjury; subornation of perjury.

24. Arson.

25. Any malicious act done with intent to endanger the safety of any persons travelling upon a railway.

26. Piracy, by the law of nations; mutiny on board a vessel for the purpose of rebelling against the authority of the Captain or Commander of such vessel; by fraud or violence taking possession of such vessel.

27. Malicious injury to property.

28. Smuggling.

29. False swearing.

30. Offenses against the bankruptcy laws.

31. Offenses against the laws relating to dangerous drugs.

Extradition shall be granted for any of the offenses numbered 27 through 31 only if the offense is punishable under the laws of both Parties by a term of imprisonment exceeding three years.

Extradition shall also be granted for attempts to commit or conspiracy to commit any of the offenses mentioned in this Article provided such attempts or such conspiracy are punishable under the laws of both Parties by a term of imprisonment exceeding three years.

Extradition shall also be granted for participation in any of the offenses mentioned in this Article.

### *Article III*

When the offense has been committed outside the territorial jurisdiction of the requesting Party, extradition need not be granted unless the laws of the requested Party provide for the punishment of such an offense committed in similar circumstances.

The words " territorial jurisdiction " as used in this Article and in Article I of the present Convention mean : territory, including territorial waters, and the airspace thereover, belonging to or under the control of one of the Contracting Parties, and vessels and aircraft belonging to one of the Contracting Parties or to a citizen or corporation thereof when such vessel is on the high seas or such aircraft is over the high seas.

### *Article IV*

A requested Party shall not decline to extradite a person sought because such person is a national of the requested Party.

### *Article V*

Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in that place or to prove that he is the identical person convicted by the courts of the requesting Party.

### *Article VI*

Extradition shall not be granted in any of the following circumstances :

1. When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished, in the territory of the requested Party for the offense for which his extradition is requested.

2. When the person whose surrender is sought has been tried and acquitted, or undergone his punishment, in a third State for the offense for which his extradition is requested.

3. When the prosecution or the enforcement of the penalty for the offense has become barred by lapse of time according to the laws of the requesting Party or would be barred by lapse of time according to the laws of the requested Party had the offense been committed in its territory.

4. When the offense is regarded by the requested Party as one of a political character or if the person sought proves that the request for his extradition has, in fact, been made with a view to trying or punishing him for an offense of a political character.

### *Article VII*

When the offense for which the extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party provides such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

### *Article VIII*

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested Party for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

### *Article IX*

The determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with the domestic law of the requested Party and the person whose extradition is sought shall have the right to use such remedies and recourses as are provided by such law.

### *Article X*

The request for extradition shall be made through the diplomatic channel.

The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the applicable laws of the requesting Party including the law prescribing the punishment for the offense as well as the law relating to the limitation of the legal proceedings or the enforcement of the penalty for the offense.

When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or commissioner of the requesting Party and by such evidence as, according to the laws of the requested Party, would justify his arrest if the offense had been committed there.

When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting Party and by a statement showing how much of the sentence has not been served.

The warrant of arrest and depositions or other evidence, given under oath, and the judicial documents establishing the existence of the conviction, or certified copies of these documents, shall be admitted in evidence in the examination of the request for extradition, when, in the case of a request emanating from Israel, they bear the signature or are accompanied by the attestation of a judge, magistrate or other official or are authenticated by the official seal of the Ministry of Justice and, in any case, are certified by the principal diplomatic or consular officer of the United States in Israel, or when, in the case of a request emanating from the United States, they are authenticated by the official seal of the Department of State.

The documents in support of the request for extradition shall be accompanied by a certified translation thereof into the language of the requested Party.

*Article XI*

In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. The application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested Party.

On receipt of such an application the requested Party shall take the necessary steps to secure the arrest of the person claimed.

A person arrested upon such an application shall be set at liberty upon the expiration of sixty days from the date of his arrest if a request for his extradition accompanied by the documents specified in Article X shall not have been received. However, this stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

*Article XII*

If the requested Party requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that Party shall require.

If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not sufficient or if such evidence or information is not received within the period specified by the requested Party, he shall be discharged from custody. However, such discharge shall not bar the requesting Party from submitting another request in respect of the same offense.

*Article XIII*

A person extradited under the present Convention shall not be detained, tried or punished in the territory of the requesting Party for any offense other than that for which extradition has been granted nor be extradited by that Party to a third State unless:

1. He has left the territory of the requesting Party after his extradition and has voluntarily returned to it;

2. He has not left the territory of the requesting Party within 60 days after being free to do so; or

3. The requested Party has consented to his detention, trial, punishment or extradition to a third State for an offense other than that for which extradition was granted.

These stipulations shall not apply to offenses committed after the extradition.

*Article XIV*

A requested Party upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought, taking into consideration the circumstances and particularly the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the nationality of the person sought, the dates upon which the requests were received and the provisions of any extradition agreements between the requested Party and the other requesting State or States.

*Article XV*

The requested Party shall promptly communicate to the requesting Party through the diplomatic channel the decision on the request for extradition.

If extradition is granted, the person sought shall be conveyed by the authorities of the requested Party to the frontier or port of embarkation or airport in the territory of that Party which the diplomatic or consular agent of the requesting Party shall designate.

If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested Party within such time as may be prescribed by the laws of that Party, he may be set at liberty and the requested Party may subsequently refuse to extradite that person for the same offense.

### *Article XVI*

To the extent permitted under the law of the requested Party and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered if extradition is granted.

### *Article XVII*

The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel accompanied by the documents referred to in Article X of the present Convention provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

### *Article XVIII*

Expenses related to the transportation of the person sought shall be paid by the requesting Party. The appropriate legal officers of the country in which the extradition proceedings take place shall, by all legal means within their power, assist the officers of the requesting Party before the respective judges and magistrates. No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Convention, shall be made by the requested Party against the requesting Party other than as specified in the second paragraph of this Article and other than for the lodging, maintenance and board of the person sought.

The legal officers, other officers of the requested Party, and court stenographers, if any, of the requested Party who shall, in the usual course of their duty, give assistance and who receive no salary or compensation other than

specific fees for services performed, shall be entitled to receive from the requesting Party the usual payment for such acts or services performed by them in the same manner and to the same amount as though such acts or services had been performed in ordinary criminal proceedings under the laws of the country of which they are officers.

### *Article XIX*

This Convention shall be ratified and the ratifications shall be exchanged in Israel as soon as possible.

This Convention shall enter into force upon the exchange of ratifications. It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Convention.

DONE in duplicate at Washington this tenth day of December, one thousand nine hundred sixty-two, corresponding to the thirteenth day of Kislev, five thousand seven hundred and twenty-three, in the Hebrew and English languages, both versions being equally authentic.

For the Government of the State of Israel:
(*Signed*) Avraham HARMAN

For the Government of the United States of America:
(*Signed*) Dean RUSK

# EXTRADITION

**Protocol Amending the Convention between the**
**UNITED STATES OF AMERICA**
**and ISRAEL of December 10, 1962**

Signed at Jerusalem July 6, 2005

NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence . . . of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, as the case may be, therein contained, in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentication thereof."

# ISRAEL

## Extradition

*Protocol amending the convention of December 10, 1962.*
*Signed at Jerusalem July 6, 2005;*
*Transmitted by the President of the United States of America to the Senate September 13, 2005 (Treaty Doc. 109-3, 109th Congress, 1st Session);*
*Reported favorably by the Senate Committee on Foreign Relations June 29, 2006 (Senate Executive Report No. 109-16, 109th Congress, 2d Session);*
*Advice and consent to ratification by the Senate September 15, 2006;*
*Ratified by the President December 21, 2006;*
*Entered into force January 10, 2007.*

# PROTOCOL

## between

## THE GOVERNMENT OF THE UNITED STATES

## and

## THE GOVERNMENT OF THE STATE OF ISRAEL

## AMENDING THE CONVENTION ON EXTRADITION

## Signed at Washington, D.C. on December 10, 1962,

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE STATE OF ISRAEL (hereinafter the "Parties");

RECOGNIZING the close bilateral relationship which exists between them reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime;

DESIRING to make more effective the Extradition Convention between the Parties, signed at Washington on December 10, 1962 (hereinafter "the 1962 Convention"); and

NOTING that "Convention" refers to the 1962 Convention as amended by this Protocol;

HAVE AGREED as follows:

## ARTICLE 1

Article II of the Convention is deleted and replaced by the following text:

"ARTICLE II

EXTRADITABLE OFFENSES

1. An offence shall be an extraditable offense if it is punishable under the laws in both Parties by deprivation of liberty for a period of one year or by a more severe penalty.

2. An offense shall also be an extraditable offense if it consists of an attempt or conspiracy to commit an offense, participation in an offense, aiding and abetting, counseling, causing or procuring the commission of an offense, or being an accessory before or after the fact, provided that such attempt, conspiracy, participation, aiding and abetting, counseling, causing or procuring, or being an accessory is punishable under the laws of both Parties by deprivation of liberty for a period of one year or by a more severe penalty.

3. For the purposes of this Article, an offense shall be an extraditable offense whether or not the laws in the Requesting and Requested Parties place the offense within the same category of offenses or describe the offense by the same terminology. In this connection, it is understood that with regard to offenses under the federal law of the United States which require a showing of such matters as interstate transportation, or use of mails or of other facilities affecting interstate or foreign commerce, such matters are merely for the purpose of establishing jurisdiction in the United States federal courts and the absence of such matters in the definition of the offense according to Israeli law shall not affect the determination of dual criminality according to this Article.

4. If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request, even if the latter offense is punishable by deprivation of liberty for a period of less than one year, provided that all other requirements for extradition are fulfilled."

## ARTICLE 2

Article IV of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE IV

EXTRADITION OF NATIONALS

1. Except as provided in this Article, the Requested Party shall not refuse extradition solely on the basis of nationality.

2. If the law of the Requested Party so requires, that Party may condition the extradition of a national and resident upon an assurance that, if the person sought is convicted and sentenced to a term of imprisonment after extradition, the person shall be returned to the Requested Party to serve the sentence imposed in the Requesting Party. The Requested Party shall advise the Requesting Party whether and when such assurance may be required.

3. Where an assurance has been provided by the Requesting Party as contemplated in paragraph 2:

   (a) That assurance shall cease to have effect if the person agrees to serve any sentence imposed in the Requesting Party or refuses to consent or withdraws a prior consent to serve the sentence in the Requested Party.

   (b) The Requesting Party shall promptly inform the Requested Party of the results of the trial or sentencing and of the appeal or other judicial review of the judgment of the sentence, if any.

   (c) If a prison sentence is subsequently imposed in the Requesting Party and has become final, the Parties shall thereafter make best efforts to transfer the person as expeditiously as possible. For purposes of this subparagraph, a sentence becomes final when there is no longer a pending appeal or other judicial review or a judgment or sentence, or there is no longer any right to an appeal or the convicted person has waived his right to appeal or otherwise to seek further judicial review of the judgment or sentence.

   (d) If the person extradited following such an assurance is given a prison sentence and is also ordered to pay a fine or to pay restitution to victims, the Requesting Party shall inform the Requested Party of such order and in such cases the Requested Party shall take steps to collect such fine or restitution to the extent possible.

   (e) To the extent not inconsistent with this Article, the terms and conditions of the return of a person following such an assurance shall be in accordance with any treaty or other agreement providing for the transfer of sentenced persons that may be in force between the Parties, unless the Parties agree otherwise.

4. If the person extradited following an assurance as set forth in paragraph 2 is given a prison sentence, the Requested Party shall enforce, according to its laws, the sentence imposed by the Requesting Party even if that sentence exceeds the maximum penalty for such offense in the Requested Party.

5. If the law of the Requested Party prohibits the extradition of a national and resident who has been convicted and sentenced in the Requesting Party for an extraditable offense, the Requested Party, upon the request of the Requesting Party, shall enforce, according to its laws, the sentence imposed by the Requesting Party even if that sentence exceeds the maximum penalty for such offense in the Requested Party.

6. If extradition of a national and resident of the Requested Party is refused because an assurance as set forth in paragraph 2 has not been provided, the Requested Party shall, at the request of the Requesting Party, submit the case to its competent authorities for decision as to prosecution. In such cases, the expenses of any investigation and prosecution in the Requested Party shall be borne by the Requested Party, unless the Parties agree otherwise."

**ARTICLE 3**

Article VI of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE VI

POLITICAL AND MILITARY OFFENSES AND DISCRIMINATORY REQUESTS

1. Extradition shall not be granted if the Requested Party determines that the offense for which the extradition if requested is a political offense.

2. The following offenses shall not be considered political offenses:

   (a) a murder or other violent crime against a Head of State or against a member of a Head of State's family;

   (b) an offense for which both the Requesting and Requested Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

   (c) murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

   (d) an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

   (e) an offense involving the making, use or possession of a bomb, grenade, rocket, or any other explosive, incendiary or destructive device with the intention to endanger life or cause serious damage to property; and

(f) a conspiracy or attempt to commit any of the foregoing offenses, or aiding, abetting, counseling or participating as an accomplice of a person who commits or attempts to commit such offenses.

3. Extradition may be refused if the competent authority of the Requested Party, which for the United States shall be the executive authority, determines that the request is for a military offense that is not an offense under ordinary criminal law.

4. Extradition may be refused if the competent authority of the Requested Party, which for the United Sates shall be the executive authority, has substantial grounds for believing that the request for extradition, though purporting to be made for an offense for which extradition may be granted, (i) was in fact made for the primary purpose of prosecuting or punishing the person sought on account of his race or religion, or (ii) was primarily politically motivated.

ARTICLE VI *bis*

PRIOR PROSECUTION

1. (a) Extradition shall not be granted if the person whose extradition is sought has been tried and either convicted or acquitted in the Requested Party for the offense for which his extradition is requested.

(b) Extradition may be denied if the person whose extradition is sought has been tried and convicted in another country for the offense for which his extradition is requested, and has served his sentence of imprisonment, or part thereof, in the Requested Party.

2. Extradition shall not be precluded by the fact that the competent authorities of the Requested Party:

(a) have decided not to prosecute the person sought for the acts for which extradition is requested; or

(b) have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts."

**ARTICLE 4**

Article VIII of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE VIII

POSTPONED AND TEMPORARY SURRENDER

1. The Requested Party may postpone the extradition proceedings against a person who is being investigated or prosecuted in that Party. The postponement may continue until the investigation or prosecution, including any appeal thereof, has been concluded.

2. If the extradition request is granted in the case of a person who is being proceeded against or is serving a sentence in the Requested Party, the Requested Party may postpone surrender until the person has served any sentence imposed or may temporarily surrender the person sought to the Requesting Party for the purpose of prosecution. A person temporarily surrendered shall be kept in custody in the Requesting Party and shall be returned to the Requested Party after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Parties.

ARTICLE VIII *bis*

LAPSE OF TIME

If required by the law of the requested Party, extradition may be denied if prosecution of the offense or execution of the penalty would, if the offense had been committed in the Requested Party, be barred by lapse of time under its laws."

## ARTICLE 5

ARTICLE IX of the 1962 Convention is deleted.

## ARTICLE 6

ARTICLE X of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE X

EXTRADITION PROCEDURES AND REQUIRED DOCUMENTS

1. All requests for extradition shall be submitted through the diplomatic channel.

2. All requests shall be supported by:

   (a) documents, statements, or other types of information which describe the identity, nationality, and probable location of the person sought;

(b) information describing the facts of the offense and procedural history of the case;

(c) the relevant texts of the provisions of the laws describing the essential elements of the offense for which extradition is requested, the punishment for the offense and any time limit on the prosecution or the enforcement of the penalty; and

(d) the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.

3. A request for extradition of a person who is sought for prosecution shall also be supported by:

(a) a copy of the warrant or order of arrest, issued by a judge or other competent authority;

(b) a copy of the charging document, if any; and

(c) such information as is needed to fulfill the requirements of Article V of the Convention.

4. A request for extradition relating to a person who has been convicted of an offense for which extradition is sought shall also be supported by:

(a) a copy of the judgment of conviction, or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

(b) information establishing the person sought is the convicted person;

(c) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d) in the case of a person who has been convicted *in absentia*, the documents required by paragraph 3.

ARTICLE X *bis*

ADMISSIBILITY OF DOCUMENTS

1. The documents, statements and other types of information that accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

(a) in the case of a request from the United States, they are authenticated by the official seal of the Department of State;

(b) in the case of a request from Israel, they are authenticated by the official seal of the Ministry of Justice; or

(c) they are certified or authenticated in any other manner acceptable by the laws of the Requested Party.

2. Such documents, statements, and other types of information shall be admissible as evidence in extradition proceedings even though they would be considered hearsay or otherwise would not conform to evidentiary rules applicable at trial.

ARTICLE X *ter*

TRANSLATION

The request and all other documents submitted by the Requesting Party shall be translated into the language of the Requested Party, unless otherwise agreed."

**ARTICLE 7**

Article XI of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE XI

PROVISIONAL ARREST

1. In case of urgency, the Requesting Party may request the provisional arrest of the person sought pending presentation of the extradition request and supporting documents. A request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Israel Ministry of Justice.

2. The application for provisional arrest shall contain:

(a) a description of the person sought and information concerning the person's nationality, if known;

(b) the location of the person sought, if known;

(c) a brief statement of the facts of the case, including, if possible, the time and location of the offense;

(d) a description of the law(s) violated;

(e) a statement of the existence of a warrant of arrest or a judgment of conviction against the person sought; and

(f) a statement that the extradition request and supporting documents shall be submitted within the time specified in paragraph 4 of this Article.

3. The Requesting Party shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

4. A person who is provisionally arrested may be discharged from custody upon the expiration of 60 days from the date of provisional arrest if the executive authority of the Requested Party has not received the extradition request and supporting documents as required in Article X of the Convention.

5. The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent rearrest and extradition of that person if the extradition request and supporting documents are delivered at a later date."

**ARTICLE 8**

Article XIII of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE XIII

RULE OF SPECIALITY

1. A person extradited under the Convention may not be detained, tried, or punished in the Requesting Party except for:

(a) any offense for which extradition was granted, or a lesser included offense based on the same facts as the offense for which extradition was granted;

(b) any offense committed after the extradition of the person; or

(c) any offense for which the executive authority of the Requested Party consents to the person's detention, trial or punishment. For the purpose oF this subparagraph:

(i) the Requested Party may require the submission of the documentation set out in Article X of the Convention; and

(ii) unless prohibited by its domestic law, the Requested Party may agree to the detention of the person extradited for 60 days while such request for consent to detention, trial or punishment is being processed.

2. A person extradited under the Convention may not be extradited to a third State or surrendered to an international tribunal for any offense prior to extradition unless the Requested Party consents.

3. Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of that person to a third State or surrender to an international tribunal, if:

(a) that person leaves the territory of the Requesting Party after extradition and voluntarily returns to it; or

(b) that person does not leave the territory of the Requesting Party within 30 days of the day on which that person is free to leave."

## ARTICLE 9

Article XVII of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE XVII

WAIVER OF OR CONSENT TO EXTRADITION PROCEEEDINGS

If the person sought consents to be surrendered to the Requesting Party, the Requested Party may surrender the person as expeditiously as possible without further proceedings."

## ARTICLE 10

Article XVIII of the 1962 Convention is deleted and replaced by the following text:

"ARTICLE XVIII

TRANSIT

1. Either Party may authorize transportation through its territory of a person surrendered to the other Party by a third State or from the other Party to a third State. A request for transit shall be transmitted through the diplomatic channel or directly between the United State Department of Justice and the Israel Ministry

of Justice. The request for transit shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2. Authorization is not required when air transportation is used by one Party and no landing is scheduled in the territory of the other Party. If an unscheduled landing does occur, the Party in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 1, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours on the unscheduled landing.

3. The Party requesting transit shall reimburse the Party through whose territory such person is transported for any expense incurred by the latter in connection with such transportation, unless otherwise agreed.

ARTICLE XVIII *bis*

REPRESENTATION AND EXPENSES

1. The Requested Party shall advise, assist, appear in court on behalf of, and shall represent the interests of the Requesting Party, in any proceedings arising out of a request for extradition.

2. The Requesting Party shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The Requested Party shall pay all other expenses incurred in that State in connection with the extradition proceedings.

ARTICLE XVIII *ter*

CONSULTATION

The United States Department of Justice and the Ministry of Justice of Israel may consult with each other directly in connection with the processing on individual cases and in furtherance of efficient implementation of the Convention."

**ARTICLE 11**

This Protocol shall apply to offenses committed before as well as after the date it enters into force.

**ARTICLE 12**

1. This Protocol shall be subject to ratification.

2. This Protocol shall enter into force on the date of the latter of the diplomatic Notes by which the Parties notify each other that their internal legal requirements for the entering into force of the Protocol have been complied with.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Protocol.

DONE at Jerusalem, this 6th day of July, 2005, corresponding to the 29th day of Sivan, 5765, in duplicate, in the English and Hebrew languages, both texts being equally authentic.

| | |
|---|---|
| **FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA** | **FOR THE GOVERNMENT OF THE STATE OF ISRAEL** |

# פרוטוקול
# בין
# ממשלת ארצות הברית
# לבין
# ממשלת מדינת ישראל
# המתקן את אמנת ההסגרה

**שנחתמה בוושינגטון הבירה ב-10 בדצמבר 1962**

ממשלת ארצות הברית של אמריקה וממשלת מדינת ישראל (להלן "הצדדים");

בהכירן ביחסים הדו-צדדיים ההדוקים הקיימים ביניהן הבאים לידי ביטוי במספר מסמכים ומנגנונים של שיתוף פעולה משפטי;

בהיותן מחויבות להידוק שיתוף הפעולה המשפטי במאבק נגד הפשע;

בשאיפתן לשפר את יעילות אמנת ההסגרה בין הצדדים, שנחתמה בוושינגטון ב-10 בדצמבר 1962 (להלן "האמנה מ-1962"); וכן

בציינן כי "אמנה" מתייחס לאמנה מ-1962 כפי שתוקנה ע"י פרוטוקול זה;

הסכימו לאמור:

**סעיף I**

סעיף 2 לאמנה מ-1962 נמחק ומוחלף ע"י הנוסח הבא:

"סעיף 2
עבירות הסגרה

1. עבירה תהיה עבירת הסגרה אם דינה לפי חוקי שני הצדדים ענישה בשלילת חירות לתקופה של שנה אחת או בעונש חמור יותר.

2. עבירה תהיה עבירת הסגרה גם אם היא מהווה ניסיון או קשירת קשר לביצוע עבירה, השתתפות בעבירה, סיוע לדבר עבירה, ייעוץ, גרימה או שידול לביצוע עבירה, או שותפות לפני או לאחר מעשה, ובלבד שניסיון, קשירת קשר, השתתפות, סיוע, ייעוץ, גרימה או שידול, או שותפות כאמור, דינם לפי חוקי שני הצדדים ענישה בשלילת חירות לתקופה של שנה אחת או בעונש חמור יותר.

3. למטרות סעיף זה, עבירה תהיה עבירת הסגרה בין אם חוקי הצד המבקש והצד המתבקש מסווגים את העבירה באותו סוג של עבירות או מתארות את העבירה באותו מינוח ובין אם לאו. בהקשר זה, מובן כי ביחס לעבירות לפי הדין הפדראלי של ארצות הברית הדורשות הוכחה של עניינים כגון הובלה בין מדינות, או שימוש בשירות הדואר או במתקנים אחרים המשפיעים על סחר בין מדינות או סחר חוץ, עניינים אלה הם אך ורק למטרות קביעת סמכות שיפוט בבתי המשפט הפדראליים של ארצות הברית, והעדר עניינים כאמור בהגדרת העבירה לפי הדין הישראלי לא ישפיע על קביעת פליליות כפולה בהתאם לסעיף זה.

4. אם אושרה הסגרה לגבי עבירת הסגרה, ניתן לאשר אותה גם לגבי כל עבירה אחרת המפורטת בבקשה, גם אם העבירה האחרונה דינה ענישה בשלילת חירות לתקופה של פחות משנה אחת, ובלבד שכל דרישות ההסגרה האחרות מולאו."

**סעיף II**

סעיף 4 לאמנה מ-1962 נמחק ומוחלף ע"י הנוסח הבא:

"סעיף 4
**הסגרת אזרחים**

1. למעט לפי הוראות סעיף זה, לא יסרב הצד המתבקש לאשר הסגרה אך ורק על בסיס אזרחות.

2. אם דין הצד המתבקש מחייב זאת, רשאי הצד להתנות את הסגרתו של אזרח ותושב בהבטחה שאם האדם המבוקש יורשע ויידון לתקופת מאסר אחרי ההסגרה, האדם יוחזר לצד המתבקש לרצות את העונש שהוטל עליו ע"י הצד המבקש. הצד המתבקש יודיע לצד המבקש האם ומתי נדרשת הבטחה כאמור.

3. מקום שניתנה הבטחה ע"י הצד המבקש כאמור בס"ק 2:

(א) הבטחה זו תחדל להיות בתוקף אם האדם מסכים לרצות כל עונש שהוטל עליו אצל הצד המבקש או מסרב להסכים או חוזר בו מהסכמה קודמת לרצות את העונש אצל הצד המתבקש.

(ב) הצד המבקש יודיע במהירות לצד המתבקש על תוצאות המשפט או מתן גזר הדין ועל הערעור או כל ביקורת שיפוטית אחרת של הפסיקה או גזר הדין, אם יש כזאת.

(ג) אם עונש מאסר מוטל לאחר מכן אצל הצד המבקש והפך לחלוט, יעשו הצדדים לאחר מכן כמיטב מאמציהם על מנת להעביר את האדם במהירות רבה ככל האפשר. למטרות תת-ס"ק זה, גזר דין הופך לחלוט כאשר אין עוד ערעור תלוי ועומד או ביקורת שיפוטית אחרת של פסק דין או גזר דין, או אין עוד זכות כלשהי לערעור או שהאדם המורשע ויתר על זכותו לערער או לבקש בדרך אחרת ביקורת שיפוטית נוספת לפסק הדין או גזר הדין.

(ד) אם האדם המוסגר בעקבות הבטחה כאמור מקבל עונש מאסר ומצווה עליו גם לשלם קנס או פיצוי לקרבנות, הצד המבקש יודיע לצד המתבקש על הצו האמור ובמקרים האמורים ינקוט הצד המתבקש צעדים לגבות קנס או פיצוי כאמור במידת האפשר.

(ה) במידה שהדבר עולה בקנה אחד עם סעיף זה, התנאים וההתניות להחזרת אדם בעקבות הבטחה כאמור יהיו בהתאם לכל אמנה או הסכם שיש בהם הוראות בדבר העברת נידונים העשויים להיות בתוקף בין הצדדים, אלא אם כן הצדדים מסכימים אחרת.

4. אם האדם המוסגר בעקבות הבטחה כקבוע בס״ק 2 מקבל עונש מאסר, הצד המתבקש יאכוף, בהתאם לחוקיו, את גזר הדין שהטיל הצד המבקש גם אם גזר הדין עולה על העונש המירבי על עבירה כאמור אצל הצד המתבקש.
5. אם דין הצד המתבקש אוסר על הסגרת אזרח ותושב אשר הורשע ונידון אצל הצד המבקש על עבירה בת הסגרה, הצד המתבקש, לבקשת הצד המבקש, יאכוף, בהתאם לחוקיו, את גזר הדין שהטיל הצד המבקש גם אם גזר הדין עולה על העונש המירבי על עבירה כאמור אצל הצד המתבקש.

6. אם הסגרת אזרח ותושב של הצד המתבקש נדחית מפני שהבטחה כקבוע בס״ק 2 לא ניתנה, הצד המתבקש, לבקשת הצד המבקש, יביא את המקרה להכרעת הרשויות המוסמכות שלו בנוגע להעמדה לדין. במקרים כאמור, בהוצאות כל חקירה והעמדה לדין אצל הצד המתבקש יישא הצד המתבקש, אלא אם כן מסכימים הצדדים אחרת.״

## סעיף III

סעיף 6 לאמנה מ-1962 נמחק ומוחלף ע״י הנוסח הבא:

### ״סעיף 6
### עבירות פוליטיות וצבאיות ובקשות מפלות

1. לא תאושר הסגרה אם הצד המתבקש קובע כי העבירה שעליה מתבקשת ההסגרה היא עבירה פוליטית.

2. העבירות הבאות לא תיראינה כעבירות פוליטיות:

(א) רצח או פשע אלים אחר נגד ראש מדינה או נגד בן משפחה של ראש מדינה;

(ב) עבירה שלגביה הן הצד המבקש והן הצד המתבקש מחויבים, בהתאם להסכם בינלאומי רב-צדדי, להסגיר את האדם המבוקש או להביא את המקרה להכרעת הרשויות המוסמכות שלו בנוגע להעמדה לדין;

(ג) רצח, הריגה, פגיעה בזדון או גרימת חבלה גופנית חמורה;

(ד) עבירה הכרוכה בחטיפה או כל צורה אחרת של כליאה לא חוקית, כולל לקיחת בן ערובה;

(ה) עבירה הכרוכה בהכנה, בשימוש או באחזקה של פצצה, רימון, רקטה או כל מתקן נפץ, תבערה או הרס בכוונה לסכן חיים או לגרום לנזק חמור לרכוש; וכן

(ו) קשירת קשר או ניסיון לבצע כל אחת מהעבירות הנ״ל, או עזרה, סיוע, ייעוץ או השתתפות כשותף לדבר עבירה של אדם המבצע או מנסה לבצע עבירות כאמור.

3. ניתן לסרב להסגרה אם הרשות המוסמכת של הצד המתבקש, אשר בארצות הברית תהיה הרשות המבצעת, קובעת כי הבקשה היא על עבירה צבאית, שאיננה עבירה לפי הדין הפלילי הרגיל.

4. ניתן לסרב להסגרה אם לרשות המוסמכת של הצד המתבקש, אשר בארצות הברית תהיה הרשות המבצעת, יש עילה מהותית להאמין כי הבקשה להסגרה, שלכאורה הוגשה על עבירה שעליה ניתן לאשר הסגרה, (i) הוגשה למעשה למטרה העיקרית של העמדת האדם המבוקש לדין או הענשתו בשל גזעו או דתו, או (ii) שהמניע לה היה פוליטי מעיקרו.

**סעיף 6 נוסף**
**תביעה קודמת**

1. (א) לא תאושר הסגרה אם האדם שהסגרתו מבוקשת נשפט והורשע או זוכה במדינה המתבקשת על העבירה שעליה מתבקשת הסגרתו.

(ב) ניתן לדחות בקשת הסגרה אם האדם שהסגרתו מבוקשת נשפט והורשע במדינה אחרת על העבירה שעליה מתבקשת הסגרתו, וריצה את עונש המאסר שלו, או חלק ממנו, אצל הצד המתבקש.

2. לא תישלל הסגרה ע״י העובדה שהרשויות המוסמכות של הצד המתבקש:

(א) החליטו לא להעמיד לדין את האדם המבוקש על המעשים שעליהם מתבקשת ההסגרה; או

(ב) החליטו להפסיק כל הליך פלילי אשר נפתח נגד האדם המבוקש על מעשים אלה.״

**סעיף IV**

סעיף 8 לאמנה מ-1962 נמחק ומוחלף ע״י הנוסח הבא:

**״סעיף 8**
**מסירה דחויה וזמנית**

1. הצד המתבקש רשאי לדחות את הליכי ההסגרה נגד אדם הנחקר או מועמד לדין אצל אותו צד. הדחייה יכולה להימשך עד לסיום החקירה או ההעמדה לדין, כולל כל ערעור עליהם.

2. אם אושרה בקשת ההסגרה במקרה של אדם שמתנהלים נגדו הליכים או המרצה עונש אצל הצד המתבקש, רשאי הצד המתבקש לדחות את המסירה עד שהאדם ירצה כל עונש שהוטל עליו, או למסור זמנית את האדם המבוקש לצד המבקש לצורך העמדה לדין. אדם שנמסר זמנית יוחזק במעצר אצל הצד המבקש ויוחזר לצד המתבקש אחרי סיום ההליכים נגד אותו אדם, בהתאם לתנאים שייקבעו בהסכמה הדדית של הצדדים.

**סעיף 8 נוסף**
**מעבר זמן**

לפי דרישת דין הצד המתבקש, ניתן לדחות בקשת הסגרה אם העמדה לדין של עבריין או ביצוע העונש, אם העבירה בוצעה אצל הצד המתבקש, מנועים בשל מעבר זמן לפי חוקיו.״

**סעיף V**

סעיף 9 לאמנה מ-1962 נמחק.

## סעיף VI

סעיף 10 לאמנה מ-1962 נמחק ומוחלף ע"י הנוסח הבא:

"סעיף 10
נהלי הסגרה ומסמכים נדרשים

1. כל הבקשות להסגרה יוגשו בערוץ הדיפלומטי.

2. כל הבקשות ייתמכו ע"י:

(א) מסמכים, הצהרות או סוגים אחרים של מידע המתארים את הזהות, האזרחות, ומיקומו הסביר של האדם המבוקש;

(ב) מידע המתאר את עובדות העבירה והעבר הנוהלי של המקרה;

(ג) הנוסחים הנוגעים בדבר של הוראות החוק המתארות את הרכיבים המהותיים של העבירה שעליה מבוקשת הסגרה, העונש על העבירה וכל מגבלת זמן על ההעמדה לדין או אכיפת העונש; וכן

(ד) המסמכים, ההצהרות, או סוגים של מידע כמפורט בס"ק 3 או ס"ק 4 לסעיף זה, כפי שבר החלה.

3. בקשה להסגרה של אדם המבוקש לצורך העמדה לדין תיתמך גם ע"י:

(א) עותק של הצו או פקודת המעצר, שהוציאו שופט או רשות מוסמכת אחרת;

(ב) עותק של כתב האישום, אם יש כזה; וכן:

(ג) מידע ככל שיידרש למילוי דרישות סעיף 5 לאמנה.

4. בקשת הסגרה המתייחסת לאדם שהורשע בעבירה שעליה מתבקשת הסגרה תיתמך גם ע"י:

(א) עותק של פסק הדין או ההרשעה, או אם עותק אינו זמין, הצהרה של רשות שיפוטית כי האדם הורשע;

(ב) מידע המוכיח כי האדם המבוקש הוא האדם המורשע;

(ג) עותק של פסק דין ההרשעה שהוטל, אם האדם המבוקש נידון, והצהרה הקובעת את היקף ביצוע גזר הדין; וכן

(ד) במקרה של אדם שהורשע שלא בפניו, המסמכים הנדרשים בס"ק 3.

סעיף 10 נוסף
קבילות מסמכים

1. המסמכים, ההצהרות, או סוגים אחרים של מידע המתלווים לבקשת הסגרה יתקבלו ויהיו קבילים כראיה בהליך הסגרה אם:

(א) במקרה של בקשה מארצות הברית, הם מאומתים ע"י החותם הרשמי של משרד החוץ;

(ב) במקרה של בקשה מישראל, הם מאומתים ע"י החותם הרשמי של משרד המשפטים; או

(ג) הם מאושרים או מאומתים בדרך אחרת כלשהי המקובלת ע"י חוקי הצד המתבקש.

2. מסמכים, הצהרות, או סוגים אחרים של מידע כאמור יהיו קבילים כראיה בהליכי הסגרה גם אם היו נחשבים לעדות שמיעה או לא היו עומדים בכללי הראיות החלים במשפט.

**סעיף 10 שלישי**
**תרגום**

הבקשה וכל המסמכים האחרים שמגיש הצד המבקש יתורגמו לשפת הצד המתבקש, אלא אם כן הוסכם אחרת."

## סעיף VII

סעיף 11 לאמנה מ-1962 נמחק ומוחלף ע"י הנוסח הבא:

**"סעיף 11**
**מעצר זמני**

1. במצב של דחיפות, הצד המבקש רשאי לבקש את מעצרו הזמני של האדם המבוקש עד להגשת בקשת ההסגרה והמסמכים התומכים. בקשה למעצר זמני תועבר בערוץ הדיפלומטי או במישרין בין משרד המשפטים של ארצות הברית לבין משרד המשפטים של ישראל.

2. הבקשה למעצר זמני תכלול:

(א) תיאור של האדם המבוקש ומידע הנוגע לאזרחותו של האדם, אם היא ידועה;

(ב) מיקומו של האדם המבוקש, אם הוא ידוע;

(ג) תיאור קצר של עובדות המקרה, כולל, אם אפשר, מועד העבירה ומיקומה;

(ד) תיאור של החוק(ים) שהופר(ו);

(ה) הצהרה על קיום צו מעצר או פסק דין מרשיע נגד האדם המבוקש; וכן

(ו) הצהרה שבקשת הסגרה ומסמכים תומכים יוגשו בתוך פרק הזמן הקבוע בס"ק 4 לסעיף זה.

3. הצד המבקש יקבל ללא דיחוי הודעה על אופן הטיפול בבקשתו למעצר זמני ועל הנימוקים לכל אי יכולת לפעול בהתאם לבקשה.

4. ניתן לשחרר ממעצר אדם הנמצא במעצר זמני בתום 60 ימים מתאריך המעצר הזמני אם הרשות המבצעת של הצד המתבקש לא קיבלה את בקשת ההסגרה ואת המסמכים התומכים כנדרש בסעיף 10 לאמנה.

5. העובדה שהאדם המבוקש שוחרר ממעצר בהתאם לס"ק 4 לסעיף זה לא תפגע במעצרו מחדש בדיעבד ובהסגרתו של אותו אדם אם בקשת ההסגרה והמסמכים התומכים נמסרים במועד מאוחר יותר."

## סעיף VIII

סעיף 13 לאמנה מ-1962 נמחק ומוחלף ע"י הנוסח הבא:

"סעיף 13
כלל הייחוד

1. אדם שהוסגר לפי האמנה אין לעצרו, לשופטו או להענישו אצל הצד המבקש אלא על:

(א) כל עבירה שלגביה אושרה הסגרה, או עבירה פחותה כלולה המבוססת על עובדות זהות לאלה של העבירה שלגביה אושרה הסגרה;

(ב) כל עבירה שבוצעה אחרי הסגרת האדם; או

(ג) כל עבירה שעליה הרשות המבצעת של הצד המתבקש מסכימה למעצרו של האדם, למשפטו או לעונשו. למטרות ס"ק זה:

(i) הצד המתבקש רשאי לדרוש את הגשת התיעוד המפורט בסעיף 10 לאמנה; וכן

(ii) אם הדין הפנימי שלו אינו אוסר זאת, הצד המתבקש רשאי להסכים למעצרו של האדם המוסגר ל-60 ימים בעוד בקשה כאמור להסכמה למעצר, משפט או עונש נמצאת בטיפול.

2. אדם המוסגר לפי האמנה אין להסגירו למדינה שלישית או למסרו לידי בית דין בינלאומי על עבירה כלשהי לפני ההסגרה אלא אם כן הצד המתבקש מסכים.

3. ס"ק 1 ו-2 לסעיף זה לא ימנעו מעצר, משפט או עונש של אדם מוסגר, או הסגרה של אותו אדם למדינה שלישית או מסירה לידי בית דין בינלאומי, אם:

(א) אותו אדם עוזב את שטחו של הצד המבקש אחרי הסגרתו וחוזר אליו מרצונו; או

(ב) אותו אדם אינו עוזב את שטחו של הצד המבקש בתוך 30 ימים מהיום שבו אותו אדם חופשי לעזוב.

## סעיף IX

סעיף 17 לאמנה מ-1962 נמחק ומוחלף ע"י הנוסח הבא:

"סעיף 17
ויתור על או הסכמה להליכי הסגרה

אם האדם המבוקש מסכים להימסר לידי הצד המבקש, הצד המתבקש רשאי למסור את האדם במהירות האפשרית ללא הליכים נוספים.

**סעיף X**

סעיף 18 לאמנה מ-1962 נמחק ומוחלף ע״י הנוסח הבא:

**״סעיף 18**
**מעבר**

1. כל צד רשאי להתיר מעבר בשטחו של אדם שנמסר לידי הצד האחר ע״י מדינה שלישית או מהצד האחר לידי מדינה שלישית. בקשה למעבר תועבר בערוץ הדיפלומטי או במישרין בין משרד המשפטים של ארצות הברית לבין משרד המשפטים של ישראל. הבקשה למעבר תכלול תיאור של האדם המועבר ופירוט קצר של עובדות המקרה. ניתן להחזיק אדם במעבר במעצר למשך תקופת המעבר.

2. אין צורך בהיתר כאשר צד אחד משתמש בתחבורה אווירית ולא מתוכננת נחיתה בשטחו של הצד האחר. אם מתקיימת נחיתה לא מתוכננת, הצד שאצלו מתקיימת הנחיתה הלא מתוכננת רשאי לדרוש בקשה למעבר בהתאם לס״ק 1, והוא רשאי לעצור את האדם עד שהבקשה למעבר מתקבלת והמעבר מתבצע, ובלבד שהבקשה מתקבלת בתוך 96 שעות מזמן הנחיתה הלא מתוכננת.

3. הצד המבקש מעבר יפצה את הצד שדרך שטחו מועבר אדם כאמור על כל הוצאה שנגרמה ע״י האחרון בקשר להעברה כאמור, אלא אם כן הוסכם אחרת.

**סעיף 18 נוסף**
**ייצוג והוצאות**

1. הצד המתבקש ייעץ, יסייע, יופיע בבית המשפט מטעם, וייצג את האינטרסים של הצד המבקש, בכל הליך הנובע מהבקשה להסגרה.

2. הצד המבקש ישלם את כל ההוצאות המתייחסות לתרגום מסמכי ההסגרה וההובלה של האדם הנמסר. הצד המתבקש ישלם את כל ההוצאות האחרות המבוצעות באותה מדינה בקשר להליכי ההסגרה.

**סעיף 18 שלישי**
**התייעצות**

משרד המשפטים של ארצות הברית ומשרד המשפטים של ישראל רשאים להיוועץ זה בזה במישרין בקשר להליכים בתיקים פרטניים ולמען קידום יישומה היעיל של האמנה.״

**סעיף XI**

פרוטוקול זה יחול על עבירות שבוצעו גם לפני וגם אחרי תאריך כניסתו לתוקף.

**סעיף XII**

1. פרוטוקול זה יהיה כפוף לאשרור.

2. פרוטוקול זה ייכנס בתוקף בתאריך המאוחרת מבין האיגרות הדיפלומטיות שבאמצעותן ידיעו הצדדים זה לזה כי הדרישות המשפטיות הפנימיות שלהם לכניסתו לתוקף של הפרוטוקול מולאו.

EXT-FARKASH-00039

לראיה החתומים מטה, שהוסמכו לכך כדין איש על ידי ממשלתו, חתמו על פרוטוקול זה.

נעשה בירושלים ביום כ״ט בסיון תשס״ה, שהוא יום 6 ביולי 2005, בשני עותקי מקור בשפות אנגלית ועברית, ולשני הנוסחים דין מקור שווה.

בשם ממשלת מדינת ישראל

בשם ממשלת ארצות הברית של אמריקה

# STATE OF ISRAEL

## Ministry of Justice

## Request for the Extradition of Yechiel Yehoshua Farkash

1. In accordance with the Convention on Extradition between the Government of the State of Israel and the Government of the United States of America (hereinafter: **"the Convention"**), and the Protocol between the Government of the State of Israel and the Government of the United States (hereinafter: **"the Protocol"**) the State of Israel hereby requests the extradition of the Israeli national **Yechiel Yehoshua Farkash**, (hereinafter: "**Farkash")**, so that he may be indicted and stand trial in Israel on the charges of:

    **a. Attempted Rape** – an offense under section 345(a)(1) of Israel's Penal Law, 5737-1977 (hereinafter: "the Penal Law") together with section 25 of the Penal Law, carrying a maximum penalty of 16 years imprisonment;

    **b. Indecent Acts Through Abuse of Authority and Educational Relationship** – an offense under section 348(d)(1) of the Penal Law, carrying a maximum penalty of 4 years imprisonment **(multiple counts)**;

    **c. Indecent Act Against a Minor Under the age of 16 Without Free Consent** – an offense under section 348(b) of the Penal Law in the circumstances described in section 345(b)(1), carrying a maximum penalty of 10 years imprisonment.

**A. Description of the Person whose Extradition is Requested**

2. Farkash's personal characteristics are as follows:

Family Name: Farkash

First Name: Yechiel

Date of Birth: [redacted]

Nationality: Israeli and American

Place of Birth: Israel

Israeli Passport No.: [redacted]

U.S. Passport No.: [redacted]

Farkash's photograph is attached hereto and marked **Attachment A**.

An affidavit signed by a police officer familiar with Farkash and attesting to the fact that the person in the copy of the photograph is Farkash, is attached hereto and marked **Attachment B.**

**B. <u>The facts of the case</u>**

3. In the course of an investigation by the Israel Police, sufficient evidence was obtained to substantiate the facts as described below:

**<u>Indecent Acts and Attempted Rape</u>**

4. During the period between 2020-2023 (hereinafter: "**the relevant period**"), the minor Y.S (D.O.B: [redacted] 2006) was a student in "Torat Hahayim" Yeshiva in Bnei-Brak, Israel, an educational institution for ultra-Orthodox boys, (hereinafter: "**the Yeshiva**") and resided in "Keren Hayeled" boarding school (hereinafter: "the boarding school").

5. During the period relevant to the charges, Farkash acted as the pedagogical director of the Yeshiva. As such, he was in charge of managing logistical aspects of the Yeshiva, including assigning work to the students in the Yeshiva. In addition, Farkash was a teacher and assisted students who were having difficulties in their studies.

6. Farkash gave Y.S extra attention, relative to other students, and summoned him to his office often. In addition, Farkash offered to buy clothing for Y.S, and even gave him money for that purpose. This was done in order to gain Y.S's trust.

7. As will be described, Farkash committed indecent acts against Y.S, through abuse of authority and educational relationship, and attempted to rape him. Due to Farkash's position in the Yeshiva as director and educator, and as such the students were under his authority, as well as the personal connection and trust that he established with the minor Y.S, the latter did not explicitly resist the indecent acts, except for the attempted rape as will be described below.

8. On multiple occasions, in the period between June 9, 2021 and October, 2023, Farkash called Y.S to his office. In the office, he used to hug Y.S, from the front or from the back. On some occasions, he pressed his erected genitalia against Y.S's body.

9. On another occasion, on or around June 9, 2022, Farkash and Y.S visited the Knesset, Israel's Parliament, in honor of Y.S's approaching 16th birthday. During the drive, Farkash touched Y.S near his lower abdomen and his genitalia. When Y.S resisted, Farkash reminded him of the different items he had purchased for him, and Y.S stopped resisting. In the Knesset, while in an elevator, Farkash hugged Y.S and pressed his genitalia against Y.S's body. On the same day, after returning to the Yeshiva, Farkash called Y.S to his office, where he hugged him, pressed his genitalia against Y.S's body, touched his own genitalia and then touched Y.S's genitalia over his clothes.

10. Additionally, in or around August 2022, Farkash took Y.S to a bed and breakfast in the Jerusalem area. During the stay, Farkash committed the following indecent acts against Y.S, all for the purpose of sexual arousal and gratification:

11. Farkash played pornography on the television; Farkash sat Y.S on his lap, hugged him, soaped his body and touched his genitalia under his underwear. While doing that, Y.S told Farkash that he wanted a smartphone, and Farkash told Y.S that he could ask anything from him at the moment and that he will allow him to use WhatsApp Web on a computer; Farkash got in the hot tub with Y.S while they both were only in their underwear. Then, Farkash put Y.S's head on his genitalia. Subsequently, Farkash pressed his genitalia against Y.S's buttocks and between his legs, trying to achieve sexual release. Farkash kissed Y.S and touched his buttocks under his underwear. In light of Y.S's resistance, Farkash said that next time it would be easier, grabbed Y.S head and kissed him on the mouth; While Y.S showered, Farkash entered the shower and kissed Y.S.

12. Moreover, in or around September, 2022, while at a water park in Holon, Israel, with Y.S and another minor, Farkash entered a hot tub with Y.S and touched Y.S' genitalia.

13. Furthermore, in or around October, 2022, Farkash invited Y.S to sleep over in an apartment that Farkash has rented near his home in Rehovot, Israel. In the apartment, on at least four different occasions, Farkash touched Y.S's genitalia – over and under his clothes.

14. On an unspecified date, during the relevant period, Farkash took Y.S out to eat. On the drive back to the Yeshiva, while Y.S was eating, Farkash touched his body.

15. On an unspecified date, in or around 2023, Farkash rented a room for him and Y.S. During their stay, for approximately one hour, Farkash committed indecent acts against Y.S for the purpose of sexual arousal and gratification, and attempted to rape him. First, Farkash instructed Y.S to sit on his lap in the jacuzzi, telling him not to be "ungrateful", prompting Y.S to comply with the request. Subsequently, while both were on the bed, Farkash inserted his penis through Y.S's boxer briefs, rubbed it against his buttocks and attempted to penetrate his anus. Y.S. resisted these actions, causing Farkash to become angry. He then forcibly grabbed Y.S, shook him, and repeatedly attempted to penetrate his anus. Despite Farkash changing their body positions periodically and making persistent attempts to achieve anal penetration, the minor Y.S. continued to resist these actions. At some point during the incident, Farkash – while wearing boxer briefs –pressed his lower body and his penis against Y.S's mouth, and subsequently took Y.S's hand and placed it on his penis. Following this, Farkash requested that Y.S. remove his underwear so that he could see his genitals, and Y.S did so. On the way back to the vehicle, Farkash hugged and kissed Y.S. During the drive from the rental unit, Farkash touched Y.S, eventually stopping the vehicle in order to continue touching him, inserting his hand into Y.S's underwear, touching his buttocks, and kissing him on the mouth, all for the purpose of sexual arousal and gratification.

16. On or around June 9, 2023, Farkash informed Y.S that he intended to celebrate his 17th birthday. Subsequently, Farkash rented a room in the Bnei-Brak area, where Farkash, Y.S., and another minor arrived. Upon arrival, Farkash and the other minor changed into bathing suits, while Y.S. removed his clothes, remaining in boxer briefs. Farkash then screened a pornographic film on the television, and later touched Y.S.'s body and genitals over his clothing. Farkash then returned Y.S to the boarding school, hugged him, and left.

17. On a date not precisely known, following the incident described in the previous paragraph, Y.S.'s counselor at the boarding school requested that he purchase a cake for the counselor's wife's birthday. Farkash agreed to drive Y.S. to purchase the cake. During the drive, Farkash forcibly grabbed Y.S. by the jaw and kissed him on the mouth, and touched his genitals over his clothing.

18. By the aforementioned actions, Farkash attempted to rape the minor Y.S. without his free consent, and committed multiple indecent acts while exploiting an educational and authoritative relationship, for the purpose of sexual arousal, gratification, or degradation.

**Indecent Acts**

19. During the relevant period, the minor D.R (born in April, 2008) was a student in the Yeshiva.
20. On an unspecified date, in December 2022, Farkash overheard others discussing D.R.'s sweater. Consequently, Farkash offered to purchase a sweater for him.
21. D.R expressed reservations, yet Farkash insisted and took him into his vehicle. They drove from the Yeshiva to a shopping center. Farkash drove the vehicle, while another minor sat in the front passenger seat and D.R sat in the center of the rear seat.
22. During the drive, Farkash reached out and stroked D.R's leg, moving along the leg up to his groin, for the purpose of sexual gratification and arousal, while repeatedly telling D.R that he loved him.
23. Upon arriving at the shopping center, Farkash asked D.R to select a sweater for him to purchase. D.R stated that he did not find a sweater he liked in the store. Farkash then approached D.R, stroked his neck, told him he loved him, and insisted on finding a sweater that would please him.
24. Subsequently, Farkash entered various stores in the shopping center with D.R. While walking between stores, Farkash stroked D.R's neck and placed his hand on his abdomen. D.R removed Farkash's hand and stated that these actions were unpleasant to him.
25. Thereafter, Farkash took D.R out to eat. On their way back, he continued to place his hand on D.R's body.
26. By his actions, Farkash committed indecent acts upon D.R, who was under the age of sixteen, without his free consent and for the purpose of sexual arousal, gratification, or humiliation.

**C. The Circumstances of Farkash's Flight from Israel**

27. On January 4, 2024, shortly after the investigation commenced, Farkash departed Israel and has not returned. There is evidence that Farkash was aware of the criminal investigation against him and even consulted a lawyer before leaving Israel.

28. According to information received by the Israeli authorities, since July, 2025, Farkash has been residing with his family in the United States in or around Lakewood Yeshiva, which is located on 617 6th St., Lakewood, NJ.

29. On April 17, 2026, Farkash was arrested in the U.S pursuant to a request for provisional arrest for purpose of extradition, submitted by the Israeli authorities.

## D. Text of the Applicable Laws

30. Section 345 of the Penal Law, provides that:

*345. (a) "A person who penetrates the body of a woman or a man under any of the following circumstances:*

*(1) without free consent;*

*…*

*Commits rape and is liable to 16 years imprisonment*

*…*

*(c) In this Article – "penetration" means inserting a body organ or an object to a woman's genitalia or a man's anus, or inserting genitalia into a person's mouth.*

31. Section 25 of the Penal Law, provides that:

*25. A person attempts to commit an offense, if he – for the purpose of committing it – commits an act that does not only constitute preparation, on condition that the offense was not completed.*

32. Section 34D of the Penal Law, provides that:

*34D. Unless legislation explicitly or implicitly provides otherwise, every enactment that applies to the commission of a completed offense itself also applies to an attempt, incitement, an attempt to incite or abetting in respect of that same offense.*

33. Section 348(b) of the Penal Law, provides that:

*348. (b) If a person committed an indecent act on a person under one of the circumstances specified in section 345(b)(1) to (5), mutatis mutandis, then he is liable to ten years imprisonment.*

34. Section 345(b) of the Penal Law, provides that:

*(b) Notwithstanding the provisions of subsection (a), the penalty for rape shall be twenty years imprisonment if the rape was committed under any of the following circumstances:*

*(1) against a minor who has not yet reached the age of sixteen, and under the circumstances set forth in subsection (a)(1), (2), (4), or (5)*

*....*

35. Section 348(d)(1) of the Penal Law, provides that:

*348.*

*...*

*(d) (1) A person who commits an indecent act upon a minor who has reached the age of fourteen, while exploiting a relationship of dependence, authority, education, supervision, employment, or service, shall be liable to four years imprisonment.*

33. Section 348(f) of the Penal Law, provides that:

*348. (f) In this Article, "indecent act" means an act for the purpose of sexual arousal, satisfaction or abasement.*

**E. Statute of Limitations**

36. The offenses for which Farkash's arrest is requested are not time-barred.

37. Section 9(a) of Israel's Criminal Procedure Law [Consolidated version], 5742-1982, (hereinafter "**the Criminal Procedure Law**") provides that:

**Prescription of Offense**

*(a) Unless otherwise provided in another law, a person shall not be brought to trial for an offense if a period as stated hereunder has elapsed since the day of his commission:*

*(1) in case of a felony punishable by death or imprisonment for life – twenty years;*

*(1a) For a crime punishable by seven years in prison or more, and which is an offense listed in Schedule B – 15 years;*

*(2) in the case of any other felony - ten years;*

*(3) in the case of a misdemeanor – five years;*

*(4) in the case of a contravention – one year.*

38. Section 24 of Israel's Penal Law, 5737-1977 (hereinafter: "**the Penal Law**") provides that:

**Classification of Offenses**

*The following are the categories of offense, by their severity:*

*(1) "Felony" – an offense, for which a penalty is set that, is more severe than three years imprisonment;*

39. The offenses of **Attempted Rape,** under section 345(a)(1) of the Penal Law**,** and of **Indecent Acts against a Minor Under the age of 16**, under section 348(b) of the Penal Law in the circumstances described in section 345(b)(1), are felonies for which the statute of limitation is 15 years.
40. The offense of **Indecent Acts Through Abuse of Authority and Educational Relationship,** under section 348(d)(1) of the Penal Law, is a felony for which the statute of limitation is 10 years.
41. As the offenses were committed in the time period between 2021-2023, they are not time-barred.

## F. Warrant of arrest

42. On December 10, 2025, Judge Zippora Giloni-Gez of the Tel-Aviv Yafo Magistrate's Court issued an arrest warrant against Farkash. The arrest warrant directs that Farkash be arrested and brought before the court for the abovementioned offenses, within 24 hours following his arrest.
43. In Israel, it is common practice not to file an indictment in the absence of the defendant. Therefore, in cases where the wanted person fled the country before being indicted, extradition requests sent by the Israeli authorities do not include an indictment. Instead, the "charging document" is the arrest warrant that includes the offenses for which the requested person is sought.
44. Moreover, it is not required under Israeli law to list the specific counts for each offense included in the warrant. With the submission of the indictment, the counts for each of the offenses will be described.

**The Arrest warrant is attached hereto and marked as "Attachment A".**

## G. Evidence

45. A detailed summary of the facts regarding the offenses allegedly committed by Farkash as well as the supporting evidence is contained in the affidavit of Rosi Kabz, senior prosecutor in the Tel-Aviv District Attorney's Office (hereinafter: **"the Prosecutor's Affidavit"**). The evidence

clearly demonstrates the existence of sufficient prima facie evidence to support the indictment against Farkash, as well as his extradition.

The Prosecutor's Affidavit is attached hereto and marked **Attachment D**.

**H. Supplementary**

46. The State of Israel will submit any additional information that the United States may require in order to enable it to accede to this Request for Extradition.

47. This Request for Extradition, together with all supporting documents attached hereto, is hereby authenticated by the official seal of the Ministry of Justice of the State of Israel.

Jerusalem, 30 day of May, 2026

**Shelley Ze`evi Barzilai**
**Director**
**Department of International Affairs**
**Ministry of Justice**
**State of Israel**

# ATTACHMENT A



# ATTACHMENT B

# Affidavit Verifying Identity from Image

I, Yaakov Meir, Israel national, holder of Israeli I.D no. 208773515

make the following true statement:

1. I am the First Sergeant Major in the Israeli Police identification no. 1920864

2. In my capacity, I am familiar with the Israel Police investigation against Yechiel Yehoshua Farkash, regarding charges of attempted rape and indecent acts against minors, the same charges that form the basis of Israel's request for Farkash's provisional arrest.
3. In addition, I am a resident of Bnei Brak, living in Weinreb St. 3. In this capacity I am familiar with "Torat Hahayim" Yeshiva and with Farkash's position within it.

4. I hereby attest to the fact that having seen Farkash with my own eyes several times, in Bnei Brak, in my personal capacity. Subsequently, in my professional capacity, I recognized his person from the investigation material. As such, I am familiar enough with his person to be able to recognize his features in a photograph, or copy thereof.

5\. I attest from my own personal knowledge that the person represented in the image attached hereto and marked "A" is in fact the same Yechiel Farkash whom the State of Israel seeks his detention in the request for his provisional arrest.

5\. Everything stated in this affidavit is true and correct to the best of my knowledge and belief, and is based upon my own personal knowledge and belief.

Sworn to under penalty of perjury.

05/02/26 Yaakov Meir

Date Signature Name in Print

I, the undersigned, Roza Kabaz hereby certify that I am a member of the Israel Chamber of Advocates, and that I am an attorney in the Office of the State Attorney and that in accordance with Section 15(b)(3) and 15(b)(4) of the Evidence Ordinance (New Version), 5731-1971, I am authorized to certify an affidavit so that it may be used as valid written evidence. I further certify that on the day of 5/2/26 there appeared before me Yaakov Meir, who identified himself to me by his identity card numbered [redacted] and after I warned him that he must declare the truth, and if he does not do so, he will be liable to the penalties prescribed by law. He stated that everything in this affidavit is true to the best of his knowledge and belief and he signed it before me.

5/2/26 Roza Kabaz

Date Signature Name in Print

רוזי כבאז, עו״ד
פרקליטות מחוז ת״א (פלילי)

# Attachement A



# ATTACHMENT C

1

משטרת ישראל

6908-12-25

## בקשה להוצאת צו מעצר
## בהעדר החשוד/ים

לכבוד
בימ"ש ב- תל אביב

היחידה : תחנת בני ברק דן
תאריך : 02/12/2025
מס' התיק : פ.א 2024 / 884

**פרטי החשוד:**

| | מס ' זהות | שם משפחה | שם פרטי | שם האב | תאריך לידה | מען | מיקוד |
|---|---|---|---|---|---|---|---|
| 1. | [redacted] | פרקש | יחיאל יהושע | נתן | [redacted] | | |

**1. סמכות מקומית :**

☒ העבירה נעברה , כולה או מקצתה , בתחום השיפוט של בימ"ש זה .
☒ היחידה הממונה על חקירת העבירה נמצאת בתחום שיפוט של בימ"ש זה .
☐ האדם עצור באיזור שיפוט של בימ"ש זה ולא ניתן להביאו לבימ"ש כאמור לעיל עקב נסיבות

**2 . פרטי העבירה(ות) : הנ"ל חשוד בכך שניצל את כוחו ומעמדו כמנהל ישיבה ופגע מינית בתלמידי ישיבה**

**3 . העובדות המהוות בסיס לחשד כנגד החשוד(ים) : תיקי החקירה**

**4 . מצורף בזה חומר חסוי (לידי השופט/ת בלבד ):** ☒ כן ☐ לא

**5 . סעיף (י) האישום :**

| האשמה | שם החוק | נסיון | סעיף האשמה | סעיף משנה | סמל |
|---|---|---|---|---|---|
| ניסיון אינוס | חוק העונשין , תשל"ז - 1977 | | 345(א)1 | | 100 |
| מעשה מגונה תוך ניצול יחסי חינוך ומרות | חוק העונשין , תשל"ז - 1977 | | 348(ד)1 | | |
| מעשה מגונה בקטין שטרם מלאו לו 16 בניגוד להסכמתו החופשית | חוק העונשין , תשל"ז - 1977 | | 348 (ב) | | |

**6.** ☒ הנ"ל טרם נעצר (ו) .
☐ הנ"ל נעצר(ו) בתאריך: ______ בשעה : _____ באשמה(ות) דלעיל .

**7 . עילת המעצר (לפי החלופות בסעיפים 13 ו- 14 לחסד"פ מעצרים)**

מסוכנות, שיבוש הליכי חקירה.

8 . פרטים על מעצרים קודמים , על בקשות מעצר קודמות הנוגעות לאותו עניין ועל החלטות בימ"ש בהן .

______

☐ רצ"ב המסמכים כאמור לעיל . ☐ לא צורפו המסמכים כאמור לעיל מהסיבה :

______

9 . הנני מבקש להוציא נגד הנ"ל צו מעצר למשך 24 **שעות** לצורך ביצוע הפעולות כדלקמן :

מעצרו חקירתו והבאתו בפני שופט

10 . אינני מתנגד לשחרורו (ם) בערבות ________________ ואבקש להתנותו בתנאי(ים) כדלקמן :
☐ התייצבות במשטרה לפי דרישה ☐ אין לצאת את הארץ לפני גמר המשפט

בית משפט השלום תל-אביב (593)

2

משטרת ישראל

☐ הפקדת דרכון ☐ אחר, פרט :

11 . (למלא סעיף זה רק בהארכת מעצר)
א. ☐ הודעה על מועד הדיון ומיקומו נמסרה ____ **בתאריך** **בשעה**
ב. ☐ העתק מבקשה זו נמסר ____ **בתאריך** **בשעה**
**במקום :** **ע"י (שם המוסר):**

**פרטי המבקש :**

| מס' אישי | דרגה | שם פרטי | שם משפחה | תפקיד | חתימה |
|---|---|---|---|---|---|
| 1920864 | רס"ר | יעקב | מאיר | חוקר | |

**לשימוש בית המשפט**

**מס' תיק המעצר של בית המשפט:** 69098-12-25

בתאריך : ______ בשעה : ______ הופיע(ו) בפני העצור(ים) הרשום(ים) לעיל :
**[אם לא הופיע(ו) יש לציין בפרוטוקול את הסיבה] ובא (י) הכוח:**
עו"ד ____________ בשם העצור(ים)- ____________
עו"ד ____________ בשם העצור(ים)- ____________

בשם המשטרה הופיע
מס' אישי: 1377683 דרגה: רס"ר שם: יצחק הרוש

אשר הצהיר בהן צדק על אמיתות תוכן הבקשה והוסיף : ____________

תגובת החשוד : ____________

החלטה : ____________

☐ המעצר בא להגן על נפגע העבירה.

שעת ההחלטה: ________ שם השופט/ת : ________ חתימת השופט/ת : ________

צינה גז-גלוני, שופטת
10-12-2025
בית משפט השלום ת"א

החלטה מפורטת ומנומקת
ניתנה בפרוטוקול הדיון מהיום
אשר מהווה חלק בלתי נפרד מהצו

בית משפט השלום
ישראל
(593)
תל-אביב-יפו

Israel Police

*69098-12-25*

# Request for Issuance of Arrest Warrant
# In the Absence of the Suspect(s)

To
The Court of Tel Aviv

Unit: Bnei Brak Station Dan
Date: December 2, 2025
File No.: P.A. 884/2024

**Suspect Details:**

| | ID No. | Family Name | First Name | Father's Name | Date of Birth | Address | Postal Code |
|---|---|---|---|---|---|---|---|
| 1. | [redacted] | Farkash | Yechiel Yehoshua | Natan | [redacted] | | |

**1. Local Jurisdiction:**

☒ The offense was committed, in whole or in part, within the jurisdiction of this Court.
☒ The unit in charge of investigating the offense is within the jurisdiction of this Court.
☐ The person is detained in the jurisdiction of this Court and cannot be brought before the above-mentioned Court due to circumstances.

**2. Offense Details: The above-mentioned person is suspected of having exploited his power and status as a yeshiva head to commit sexual offenses against yeshiva students.**

**3. Factual Basis for the Suspicion Against the Suspect(s): Investigation files.**

**4. Confidential Material Attached (for judge's review only):** ☒ Yes ☐ No

**5. Section(s) of the Indictment:**

| Offense | Law Name | Attempt | Section | Sub-section | Symbol |
|---|---|---|---|---|---|
| Attempted rape | Penal Law 5737-1977 | | 345(a)1 | | 100 |
| Indecent act while exploiting educational and authoritative relationship | Penal Law 5737-1977 | | 348(d)1 | | |
| Indecent act against a | Penal Law 5737-1977 | | 348(b) | | |

[Stamp: Magistrates Court – Tel Aviv - Yafo (593)]

| | | | | | |
|---|---|---|---|---|---|
| minor under 16 without free consent | | | | | |

**6.** ☒ The above-mentioned person has not yet been arrested.
☐The above-mentioned person was arrested on: _______________ at [time]: _______________ on the above-mentioned charge(s).

**7. Grounds for Arrest (pursuant to sections 13 and 14 of the Criminal Procedure Law (Arrests):**

Danger to the public, obstruction of investigative proceedings.

8. Details of prior arrests, prior arrest requests concerning the same matter, and court decisions thereof:

______________________________

☐ The aforementioned documents were submitted. ☐ The aforementioned documents were not submitted for the following reason:

______________________________

9. I hereby request the issuance of an arrest warrant against the above for a period of 24 **hours** for the purpose of:

His interrogation and bringing him before a judge.

10. I do not object to his release on bail _______________ And I request the imposition of the following condition(s):

☐ Appearance at the police upon request.
☐ Prohibited from leaving the country until the conclusion of the trial.
☐ Deposit of passport
☐ Other – specify:

[Stamp: Magistrates Court – Tel Aviv - Yafo (593)]

11. (To be filled only in case of remand extension)

a. ☐ Notice of the hearing date and location was delivered ___ on **[date]** _____________ at **[hour]** _____________

b. ☐ A copy of this request was delivered on **[date]** _____________ at **[hour]** _____________ at **[location]** _____________ **by [name of person delivering]**:

**Applicant Details:**

| P.N. | Rank | First Name | Family Name | Position | Signature |
|---|---|---|---|---|---|
| 1920864 | Staff Sergeant Major | Yaakov | Meir | Investigator | |

---

**For Court Use**

**Court Arrest File No.**: *69098-12-25*

On [date] _____________ at [hour] _____________ The above-mentioned detainee(s) appeared before the Court:
[**If not present, reason must be stated in the hearing protocol**]
Represented by:
Adv. _____________ on behalf of the detainee(s): _________________
Adv. _____________ on behalf of the detainee(s): _________________

The following person appeared on behalf of the police:

| P.N. | Rank | Name |
|---|---|---|
| *8308073* | *Staff Sergeant Major* | *Yitzchak Hartuv* |

who declared under oath the truth of the contents of the request and added:
_____________________________________________
_____________________________________________
Suspect's Response: _____________________________________________
_____________________________________________

Decision: _____________________________________________

[Stamp: Magistrates Court – Tel Aviv - Yafo (593)]

Israel Police

☐ The arrest is to protect the victim of the offense.

Time of Decision: _____ Judge's Name: _________ Judge's Signature: _________

[Stamp: A detailed and reasoned decision was given in the hearing protocol of today, which forms an integral part of this warrant.]

[Signature and Stamp: Tzipi Gez-Giloni, Judge
10-12-2025 Tel Aviv Magistrates Court]

[Stamp: Magistrates Court – Tel Aviv - Yafo (593)]

# ATTACHMENT D

# AFFIDAVIT

I, Attorney Rosi Kabz, having been warned that I must tell the truth and that if I do not do so I will be subject to the penalties prescribed by law, depose and state as follows:

1. I am, and since 1999 have been working as a prosecutor in the Office of the Tel-Aviv District Attorney' and currently serve as a senior prosecutor. In my capacity as a prosecutor, I have been given the responsibility of conducting the prosecution of **Yechiel Yehoshua Farkash** (hereinafter: **"Farkash")** for the offenses described in the Request for his Extradition.

2. This affidavit is submitted in support of the State of Israel's Request for the Extradition of Farkash, so that he may stand trial for the offenses listed in the Request for his Extradition.

3. The purpose of this affidavit is to describe the principal evidence against **Farkash** with respect to the offenses for which he is charged, and to describe the elements of crimes Farkash is charged with to having committed, according to Israeli law.

4. **As this case involves sexual offenses, in accordance with Article 352 of the Penal Law 5737-1997, in order to protect the victims' identities, the victims as well as their family members will be referred to only by their initials.**

5. The information set forth in this affidavit is based upon a variety of materials collected or prepared in the course of the Israel Police investigation. This evidence includes statements made by the following individuals:
   a) **Y.S.** (hereinafter: "Y.S."**)**, Farkash's minor victim;
   b) **D.R.** (hereinafter: "A.K."**)**, Farkash's minor victim;
   c) **Minors E.H and E.B.D**, who knew Farkash and the victims;
   d) Personnel from "Torat Hahayim" Yeshiva (hereinafter: **"the Yeshiva"**) and "Keren Hayeled" boarding school (hereinafter: **"the boarding**

**school"**) including Binyamin Buskila, Lea Godlavsky, Pesach Kaner, Rabbi Refael Moshe Alaluf and Binyamin Frenkel;

e) **M.S**, Y.S's father.

The evidence also includes email correspondence between Farkash and Y.S and between Farkash and Yeshiva personnel.

6. The statements provided by witnesses that are referred to in this affidavit, were taken by police investigators in the Tel-Aviv district of the Israeli Police.

**The Factual Background**

7. In the course of an investigation by the Israel Police, sufficient evidence was obtained to substantiate the facts as described below:

**Indecent Acts and Attempted Rape**

8. During the period between 2020-2023 (hereinafter: "**the relevant period**"), the minor Y.S (D.O.B: [redacted] 2006) was a student in "Torat Hahayim" Yeshiva in Bnei-Brak, Israel, an educational institution for ultra-Orthodox boys, (hereinafter: "**the Yeshiva**") and resided in the "Keren Hayeled" boarding school (hereinafter: "the boarding school").

9. During the period relevant to the charges, Farkash acted as the pedagogical director of the Yeshiva. As such, he was in charge of managing logistical aspects of the Yeshiva, including assigning work to the students in the Yeshiva. In addition, Farkash was a teacher and assisted students who were having difficulties in their studies.

10. Farkash gave Y.S extra attention, relative to other students, and summoned him to his office often. In addition, Farkash offered to buy clothing for Y.S, and even gave him money for that purpose. This was done in order to gain Y.S's trust.

11. As will be described, Farkash committed indecent acts against Y.S, through abuse of authority and educational relationship, and attempted to rape him. Due to Farkash's position in the Yeshiva as director and educator, and as such the students were under his authority, as well as the personal connection and trust that he established with the minor Y.S, the latter did not explicitly resist the indecent acts, except for the attempted rape as will be described below.

12. On multiple occasions, in the period between June 9, 2021 and October, 2023, Farkash called Y.S to his office. In the office, he used to hug Y.S, from the front or from the back..On some occasions, he pressed his erected genitalia against Y.S's body.

13. On another occasion, on or around June 9, 2022, Farkash and Y.S visited the Knesset, Israel's Parliament, in honor of Y.S's approaching 16th birthday. During the drive, Farkash touched Y.S near his lower abdomen and his genitalia. When Y.S resisted, Farkash reminded him of the different items he had purchased for him, and Y.S stopped resisting. In the Knesset, while in an elevator, Farkash hugged Y.S and pressed his genitalia against Y.S's body. On the same day, after returning to the Yeshiva, Farkash called Y.S to his office, where he hugged him, pressed his genitalia against Y.S's body, touched his own genitalia and then touched Y.S's genitalia over his clothes.

14. Additionally, in or around August 2022, Farkash took Y.S to a bed and breakfast in the Jerusalem area. During the stay, Farkash committed the following indecent acts against Y.S, all for the purpose of sexual arousal and gratification:

15. Farkash played pornography on the television; Farkash sat Y.S on his lap, hugged him, soaped his body and touched his genitalia under his underwear. While doing that, Y.S told Farkash that he wanted a smartphone, and Farkash told Y.S that he could ask anything from him at the moment and that he will allow him to use WhatsApp Web on a computer; Farkash got in the hot tub with Y.S while they both were only in their underwear. Then, Farkash put Y.S's head on his genitalia. Subsequently, Farkash pressed his genitalia against Y.S's buttocks and between his legs, trying to achieve sexual release. Farkash kissed Y.S and touched his buttocks under his underwear. In light of Y.S's resistance, Farkash said that next time it would be easier, grabbed Y.S head and kissed him on the mouth; While Y.S showered, Farkash entered the shower and kissed Y.S.

16. Moreover, in or around September, 2022, while at a water park in Holon, Israel, with Y.S and another minor, Farkash entered a hot tub with Y.S and touched Y.S' genitalia.

17. Furthermore, in or around October, 2022, Farkash invited Y.S to sleep over in an apartment that Farkash has rented near his home in Rehovot, Israel. In the apartment, on at least four different occasions, Farkash touched Y.S's genitalia – over and under his clothes.

18. On an unspecified date, during the relevant period, Farkash took Y.S out to eat. On the drive back to the Yeshiva, while Y.S was eating, Farkash touched his body.

19. On an unspecified date, in or around 2023, Farkash rented a room for him and Y.S. During their stay, for approximately one hour, Farkash committed indecent acts against Y.S for the purpose of sexual arousal and gratification, and attempted to rape him. First, Farkash instructed Y.S to sit on his lap in the jacuzzi, telling him not to be "ungrateful", prompting Y.S to comply with the request. Subsequently, while both were on the bed, Farkash inserted his penis through Y.S's boxer briefs, rubbed it against his buttocks and attempted to penetrate his anus. Y.S. resisted these actions, causing Farkash to become angry. He then forcibly grabbed Y.S, shook him, and repeatedly attempted to penetrate his anus. Despite Farkash changing their body positions periodically and making persistent attempts to achieve anal penetration, the minor Y.S. continued to resist these actions. At some point during the incident, Farkash – while wearing boxer briefs –pressed his lower body and his penis against Y.S's mouth, and subsequently took Y.S's hand and placed it on his penis. Following this, Farkash requested that Y.S. remove his underwear so that he could see his genitals, and Y.S did so. On the way back to the vehicle, Farkash hugged and kissed Y.S. During the drive from the rental unit, Farkash touched Y.S, eventually stopping the vehicle in order to continue touching him, inserting his hand into Y.S's underwear, touching his buttocks, and kissing him on the mouth, all for the purpose of sexual arousal and gratification.

20. On or around June 9, 2023, Farkash informed Y.S that he intended to celebrate his 17th birthday. Subsequently, Farkash rented a room in the Bnei-Brak area, where Farkash, Y.S., and another minor arrived. Upon arrival, Farkash and the other minor changed into bathing suits, while Y.S. removed his clothes, remaining in boxer briefs. Farkash then screened a pornographic film on the

television, and later touched Y.S.'s body and genitals over his clothing. Farkash then returned Y.S to the boarding school, hugged him, and left.

21. On a date not precisely known, following the incident described in the previous paragraph, Y.S.'s counselor at the boarding school requested that he purchase a cake for the counselor's wife's birthday. Farkash agreed to drive Y.S. to purchase the cake. During the drive, Farkash forcibly grabbed Y.S. by the jaw and kissed him on the mouth, and touched his genitals over his clothing.

22. By the aforementioned actions, Farkash attempted to rape the minor Y.S. without his consent, and committed multiple indecent acts while exploiting an educational and authoritative relationship, for the purpose of sexual arousal, gratification, or degradation.

**Indecent Acts**

23. During the relevant period, the minor D.R (born in April, 2008) was a student in the Yeshiva.

24. On an unspecified date, in December 2022, Farkash overheard others discussing D.R.'s sweater. Consequently, Farkash offered to purchase a sweater for him.

25. D.R expressed reservations, yet Farkash insisted and took him into his vehicle. They drove from the Yeshiva to a shopping center. Farkash drove the vehicle, while another minor sat in the front passenger seat and D.R sat in the center of the rear seat.

26. During the drive, Farkash reached out and stroked D.R's leg, moving along the leg up to his groin, for the purpose of sexual gratification and arousal, while repeatedly telling D.R that he loved him.

27. Upon arriving at the shopping center, Farkash asked D.R to select a sweater for him to purchase. D.R stated that he did not find a sweater he liked in the store. Farkash then approached D.R, stroked his neck, told him he loved him, and insisted on finding a sweater that would please him.

28. Subsequently, Farkash entered various stores in the shopping center with D.R. While walking between stores, Farkash stroked D.R's neck and placed his hand on his abdomen. D.R removed Farkash's hand and stated that these actions were unpleasant to him.

29. Thereafter, Farkash took D.R out to eat. On their way back, he continued to place his hand on D.R's body.

30. By his actions, Farkash committed indecent acts upon D.R, who was under the age of sixteen, without his free consent and for the purpose of sexual arousal, gratification, or humiliation.

**Evidence Relating to the Charges against Farkash**

31. For the remainder of this affidavit, I will describe the evidence collected by the Israel Police, which clearly indicates Farkash's culpability for the above-mentioned crimes:

a. Y.S.'s Statements, dated January 1, 2024 and January 14, 2024

32. Y.S stated that he was a student in "Keren Hayeled" boarding school and "Torat Hahayim" Yeshiva. He stated that he was sexually assaulted by a man named Yechiel Yehoshua Farkash.

33. Y.S stated that Farkash used to touch him against his will in multiple instances over the period of 1.5 years. He mentioned that Farkash still calls him on the phone and that the last assault occurred approximately 1.5 months before he filed the complaint.

34. Y.S stated that Farkash would call him to his office and hug him in a way that he could feel Farkash's genitalia rubbing against his body.

35. In his statements, Y.S described his relationship with Farkash. He stated that he entered the Yeshiva at 13 years old, when Farkash acted as a secretary in charge of the logistics. In his statement, Y.S emphasized that Farkash is a powerful and influential persona, which is why he is scared of him and was dependent on him. YS stated that Farkash would give him money, buy him things. There were always hugs and physical touch, which were gradually prolonged over time.

36. Y.S stated that until he was 15, nothing special happened, but Farkash did normalize nudity (e.g while they were changing out of their clothing before they went into the mikvah (ritual bath)).

37. Close to Y.S's 16th birthday, Farkash took him to visit the Knesset. He described how Farkash touched his genitals over his clothes during the ride and that he hugged him in the elevator in the Knesset while pressing his genitals against his body. Y.S stated that he wanted to tell Farkash to stop, but he was scared. After the trip to the Knesset, Farkash called him to his office and hugged him again while pressing his genitals against his body.

38. When Y.S was asked how was Farkash supposed to know that he was not interested in the physical touch, he responded "he saw my face, I had a forced smile and I froze". Y.S added that one time Farkash said he wouldn't touch him because Y.S didn't like it, and that he will "get over it"". Subsequently, Farkash said that on Thursday they will go to a "tzimmer" (cabin/bed and breakfast) and that he will "save the love for there". This, while still hugging Y.S and saying "I love you".

39. At the bed and breakfast, Farkash played sexually explicit content on the TV. Farkash undressed Y.S (Y.S removed some clothes himself). Y.S stated that he told Farkash that he did not want that, that he felt terrible, and that "he took his soul". They both entered the jacuzzi wearing boxers. YS stated that while the jacuzzi filled, Farkash sat Y.S on his lap on the toilet, hugged him, applied soap all over his body, and inserted his hands into Y.S boxers, seemingly by accident, touching his penis. Farkash placed Y.S head on his penis in the water, and his penis was on Y.S buttocks, attempting to ejaculate (and possibly did). There was no penetration. Farkash kissed Y.S on the mouth and in the shower, stating, "Next time it will be easier." During this time, Farkash told Y.S he could ask for anything he wanted, and Y.S expressed a desire for a smartphone.

40. Y.S told that approximately one month after Farkash took him and another boy from the Yeshiva (E.S, which Y.S believes was also a victim) to a water park. Farkash sat next to Y.S in the pool and in the jacuzzi, and touched Y.S's genitals in public.

41. Approximately one month later, Farkash took Y.S to an apartment in Rehovot. They laid in bed together and Farkash touched his genitals over the clothes. This recurred 4-5 times over several weekends.

42. Farkash continued to touch Y.S's penis, hug him, take him in his car, buy him food, and touch him during these activities. Y.S stated that he felt unable to refuse.

43. Around Y.S 17th birthday, Farkash booked a room by the hour, inviting another boy (aged 15-16), who had been with them at the Knesset.
44. They entered the same room. Y.S removed his clothes down to his boxers. Farkash and the other boy remained in their swimsuits. Farkash had promised Y.S a swimsuit but did not provide one. Pornography was played, likely by Farkash.
45. In the jacuzzi, Farkash touched Y. S's penis and entire body over his clothes. Y.S stated that he felt Farkash touched him less as a sort of birthday "present".
46. Farkash then drove Y.S back to the boarding school, kissed and hugged him, and left.
47. In his statements, Y.S describes one situation where Farkash attempted to rape him. He took him alone to a room by the hour with a jacuzzi. In the jacuzzi, Farkash "turned him over in every position imaginable." Farkash asked Y.S to remove his boxers to see his "thing," and Y.S complied. Farkash did not touch his penis at this point. Farkash then told Y.S to sit on him. Y.S described Farkash being behind him on the bed, pulling up Y.S's boxers and placing his penis underneath.
48. Farkash attempted to penetrate Y.S anus. Y.S is unsure if he succeeded, stating that lasted about 7 minutes. YS stated that the entire event lasted approximately one hour.
49. Y.S felt physical pain from being held, but not in his anus. He felt Farkash trying to enter but not succeeding. He is unsure if Farkash ejaculated.
50. After they got up from the bed, Farkash asked Y.S to remove his underwear. Farkash also placed his penis (while wearing boxers) on Y.S mouth.
51. Farkash drove Y.S back, calling him "garbage" and "ungrateful," and saying he "didn't go with the flow."
52. Farkash continued to touch Y.S's penis and body and kiss him at the Yeshiva. Farkash stopped the abuse only when he realized there was an attempt to open a case against him and he might be exposed.
53. Farkash stopped hugging Yehuda but continued to call him several times a week to ensure "business as usual."
54. In his second statement, Y.S repeated his version of the attempted rape. In addition, he elaborated on two other incidents.

55. In the first incident, YS stated that Farkash drove Y.S towards Ben Shemen Forest. Yehuda was drowsy. Farkash called him "ungrateful" and said he wouldn't take him again.
56. After Yehuda apologized, Farkash turned the car around and drove back to Ben Shemen Forest. Y.S was drowsy and woke up at 2:00 AM in the forest, unaware of what Farkash might have done. Farkash then drove him home, angry.
57. In another instance, YS stated that Farkash sent him to buy a cake. On the way, Farkash kissed Y.S on the mouth, forcefully grabbing his jaw. He also touched Y.S's penis over his clothes.
58. In addition, in another incident at the Dead Sea, Farkash touched Y.S under his clothes. Farkash's 12-13-year-old son was present.

b. D.R's Statement, dated February 26, 2024

59. D.R. has been studying at the "Torat Chaim" Yeshiva for a year and a half, starting from age 14. He met Farkash shortly after he entered the Yeshiva.
60. D.R stated that Farkash offered to buy D.R. a new sweater after D.R. mentioned his friends disliked his current one. D.R. stated he could ask his parents for a sweater.
61. D.R stated that Farkash forcibly took D.R. into his car, making D.R. feel uncomfortable. During the entire car ride, Farkash stroked D.R.'s leg down to the inner groin area.
62. Near the store, Farkash continued to stroke D.R.'s neck and placed his hand on D.R.'s stomach. Inside the store, Farkash insisted D.R. choose a sweater. When D.R. said he didn't like any, Farkash raised his voice, stating D.R. wouldn't leave until he had a sweater. D.R. felt uncomfortable. After leaving the store, Farkash approached D.R and said that he loves him. Farkash continued to stroke D.R.'s neck and place his hand on his stomach as they visited other stores. D.R. eventually pushed Farkash's hand away, stating he was uncomfortable. Farkash then continued the touching more gently.
63. D.R. told his mother that same night about Farkash's acts. His mother stated it was inappropriate and instructed D.R. not to go near Farkash again. After speaking with his mother, D.R. told Farkash not to approach him anymore and

that he did not want to speak with him. Approximately one month prior to this statement, D.R. reported the incidents to a Rabbi from the Yeshiva, who subsequently reported it.

c. <u>Statement by Binyamin Buskila, dated January 4, 2024</u>

64. Buskila, who was a counselor at Keren HaYeled boarding school for the past seven years, served as Y.S's direct counselor for nearly five years, overseeing his daily life and needs.

65. Buskila stated that Y.S had confessed before him to sexual abuse by Farkash, stating that Farkash "burned his soul." Y.S described incidents involving "tzimmers" (bed and breakfasts), Farkash lying on him, touching and performing oral sex on him. Y.S also recounted a forced kiss with tongue, where Farkash reacted with anger and accusations of ungratefulness when Y.S resisted. Buskila, without questioning, promised to report the abuse and arrange therapy. Y.S was crying and disoriented.

66. Y.S further detailed before Buskila attempted anal penetration, forced exposure of his penis, and an incident at age 16 where Farkash took him to a tzimmer for his birthday and displayed pornography.

67. Buskila knew of the close relationship, with Farkash treating Y.S as his "right-hand man." Farkash frequently made seemingly innocent requests for Y.S's time, such as going out to eat, helping move furniture, or staying out after Yeshiva (perhaps bi-weekly), which Buskila initially found unremarkable.

68. Y.S fully disclosed the abuse to Buskila on December 27, 2023, also mentioning other victims.

69. In his statement, Buskila emphasized Farkash's respected position and power within the Yeshiva. Buskila stated that Farkash held significant power as the association's director, financial manager, and organizer of trips and events. He also taught at an affiliated Yeshiva, possessing authority beyond a typical teacher, functioning as the "physical director" to Rabbi Alaluf's "spiritual director."

70. Buskila stated that Y.S further revealed that Binyamin Frankel was aware of the abuse, stating Farkash had kissed Frankel (possibly on the mouth) and also kissed Y.S in Frankel's presence.

71. Subsequently, Buskila stated that a week before he gave his statement to the Police, Farkash contacted Y.S, and Buskila advised Y.S not to respond to Farkash.

d. <u>Statement by Lea Godlavsky, dated March 5, 2024</u>

72. Lea is the manager of "Keren Hayeled" boarding school, which is a therapeutic facility. The boarding school treats children aged 8-18 that are dealing with defiance problems towards parents and other emotional problems.

73. Lea stated that Farkash is not a boarding school employee and that he works at the Torat Hahayim Yeshiva. The boarding school sends children to study in this Yeshiva.

74. Lea also stated that there is a student named Y.S who approached his boarding school youth counselor about two months ago and said that the suspect touched him in inappropriate places and committed inappropriate acts.

75. She forwarded the report to a supervisor from the Ministry of Welfare, to the welfare officer in Modi'in Illit, and to the Torat Chaim Yeshiva.

76. Lea noted that the counselor who reported is an employee of the boarding school. No contact was further established with the parties to whom the report was forwarded. She knew D.R had filed a police complaint, so she thought it was being handled. She had no further contact with welfare services.

77. She said that Y.S is in the boarding school due to severe behavioral problems at home. In her opinion, he also suffers from emotional problems. There is a social worker accompanying him on behalf of the boarding school.

e. <u>Statement by Pesach Kaner, dated February 22, 2024</u>

78. Kaner is an educational counselor in the Yeshiva. He stated that Farkash managed the finances in the Yeshiva until he resigned recently.

79. Kaner stated that about a month and a half ago, information was received from "Keren HaYeled" that a student named Y.S had spoken with his counselor about an ongoing sexual relationship and severe exploitation. This information was reported to a social worker and to Rabbi Allalouf, the head of the Yeshiva. Rabbi Allalouf confirmed that the report had been forwarded to him. Y.S's counselor spoke with Kaner about the matter, and currently, Y.S no longer studies at the Yeshiva.

80. Kaner noted that apart from Y.S, he is aware of at least three additional students who were victims of Farkash and mentioned their full names.

f. Statement by E.H, dated February 6, 2024

81. E.H met Farkash on a trip to the Knesset. Farkash asked E.H, who was a minor at the time, to spend time with Y.S and from then on, he developed a relationship with Farkash, which was not sexual.

82. E.H said Farkash would take him on trips and even go out with him on Thursday nights, which E.H did not find strange.

83. In his statement, E.H mentioned Y.S's 17th birthday, when Farkash took him and Y.S to a place with a pool in Bnei Brak. He said he knew that Y.S had a good relationship with Farkash and that he took him alone to various places.

84. E.H also said that Farkash bought him things, but never harmed him. He described the incident when Farkash took him and Y.S to a bed and breakfast and confirmed that there was sexually explicit content on the TV, but that it was on by mistake.

g. Statement by E.B.D, dated February 28, 2024

85. E.B.D was a student in Torat Hahayim Yeshiva for two years. He identified Farkash as the secretary and accountant of the Yeshiva.

86. He stated that he told Rabbi Kaner, the educational counselor, that Farkash touched him, approached him, caressed him along his arm, over his clothes, on his cheek. This was done in an extreme manner. Farkash asked him many times to come study with him in his room, but he refused. Farkash would often touch him along his waist, caress from his waist and continue to his back, over his clothes. E.B.D didn't say anything to him in response, he stated that he didn't understand that it was problematic. He stated that Farkash did this many times, and that every time Farkash spoke with him, it involved touch. E.B.D stated that this happened near his room in the boarding school and in various places in the Yeshiva. He stated that Farkash would Never touch him near a staff member, but sometimes near other students.

87. E.B.D stated that Farkash would take students to buy them food in his car and would touch them. He saw him touching three students, including Y.S. He said that Farkash always indulged them with money, buying things.

h. Statements by Rabbi Refael Moshe Alaluf, dated February 1, 2024 and February 5, 2024

88. Rabbi Alaluf is the director of special education in the Yeshiva. He said that Farkash was registered as the director of regular education and was in charge of the financial management. Alaluf stated that Farkash resigned one month prior to Rabbi Alaluf's statement, allegedly due to "weakness". However, according to Rabbi Alaluf, it is clear that it was not the genuine reason.

89. Alaluf stated that on December 30, 2023, he received an update from Binyamin Frenkel, Y.S's counselor at the Yeshiva, stating that Farkash was touching students. Binyamin Frankel told Alaluf that Farkash had inappropriate relationships with students. Regarding Y.S, Frankel told Alaluf that he thought something was going on, and he also told Alaluf that he himself had received kisses from Farkash in his office. Frenkel told Alaluf that Farkash spoke with him about students, referring to them as "beautiful boys".

90. Rabbi Alaluf stated that he then spoke with the inspector from the Ministry of Education and the inspector for counselors. He wanted to receive clarification as to who was supposed to inform the police. They told him to ensure that the boarding school did it, and he stated that they verified that they indeed did so.

91. Alaluf stated that the day after the report from YS's counselor, Farkash did not come to work, and he said he was on his way to a lawyer. Farkash said it was in connection with Y.S. He said that Y.S had complained about him and that an investigation would probably begin, and he was going to consult with a lawyer. Farkash said to Rabbi Alaluf that he wasn't afraid about the matter itself, but about his reputation and the Yeshiva's name. He said he was going to the best lawyer in the field – Yehuda Fried. Alaluf said that he wished him good luck. Farkash sent him an email asking that he be in touch regarding this matter through his lawyer. Farkash wrote the lawyer's number and asked Alaluf to delete that email.

92. Alaluf stated that Farkash wrote him an email after he heard that Binyamin Frenkel had spoken with him. In the email, he said he only indulges the students to strengthen them in their studies and that he understands he made a mistake.

93. Rabbi Alaluf also stated that he met with Y.S two days after talking with Binyamin Frenkel. In this conversation, Y.S denied there were inappropriate things, and that Farkash would just reward him for studying well.

94. Rabbi Alaluf added that after Farkash left the Yeshiva, he was approached by a student who told him that he saw Farkash touching Binyamin Frenkel by putting his hands in Frenkel's pants.

i. <u>Statement by Binyamin Frenkel, 30 January, 2024</u>

95. Frankel, a former counselor and mentor at Torat HaChaim for about a year, observed a very close relationship between Y.S and Farkash, that Farkash would give exclusive "air kisses" to Y.S and outings just with Y.S. He stated that he did not personally witness inappropriate behavior with other students.

96. Frenkel stated that approximately six months prior, Y.S and E.S (another student) reported to him that the suspect indulged them, bought them gifts, and touched them inappropriately. When Frenkel spoke with Y.S, Y.S appeared confused. Frankel stated that he informed Rabbi Alaluf, the head of the Yeshiva, who promised to investigate, but Frankel is unaware of the outcome.

97. Frankel stated that he witnessed Farkash placing a hand on a student's shoulder and giving an "air kiss" to Y.S. Y.S vaguely reported being touched by Farkash, mentioning that E.S was also harmed six months prior. E.S confirmed Farkash's actions towards his brother and himself.

j. <u>Statement by M.S (Y.S's father), dated January 1, 2024</u>

98. M.S stated that he heard from Y.S's counselor about the sexual abuse. Y.S did not tell him anything, but he could see that Y.S harbored feelings of intense anger and regret.

k. <u>Email correspondence between Farkash and Y.S</u>

99. The investigation revealed multiple email correspondence dated from October 2022 to August 2024 between Farkash and YS.

100. The emails reveal a relationship of an unusual, and inappropriate emotional nature. The exchanges include intense and intimate expressions of affection by Farkash towards Y.S such as "go to sleep sweetheart," "I love you very very very much," "I'm crazy about you," and "missing you terribly," alongside late-night communications. Y.S also sent Farkash emails saying "I really miss you". In one of the emails Farkash attached a picture of the beds in the apartment he stayed in the weekends with Y.S.

l. <u>Email correspondence between Farkash and Rabbi Alaluf</u>

101. The correspondence between Farkash and Rabbi Alaluf, shows Farkash's claims of an attempt to frame him. From the email it arises that Farkash spends time in the company of boys. In one of his emails, Farkash asked Rabbi Alaluf to meet with his lawyer, while instructing him to delete these emails and use a separate phone number for sensitive conversations.

**<u>Elements of the Crimes</u>**

102. **Attempted Rape** – an offense under section 345(a)(1) of Israel's Penal Law, 5737-1977 (hereinafter: "the Penal Law") together with section 25 of the Penal Law, carrying a maximum penalty of 16 years imprisonment.

a. Criminal act – the act of rape is defined as "*penetrating a woman's or a man's body in one of the following circumstances: (1) without their consent...*". Penetration is defined as "*inserting a body organ or an object to a woman's genitalia or a man's anus, or inserting genitalia into a person's mouth*". When the act is attempted but not completed, it constitutes the offense of attempted rape. Therefore, it must be proven that the act or conduct went beyond preparation but was not completed. The behavior is sufficient to constitute an attempt, if it goes beyond preparatory conduct alone. The attempt is expressed in the execution of an action or actions or part of a series of actions that, had they not been interrupted, would have satisfied the behavioral basis of the offense of rape.

b. Criminal intent – this is a behavioral offense, and therefore it must be proven that the person attempting to commit the act of rape was aware of the nature of the physical act and of the circumstances of the criminal act, in this case that the victim did not give his consent.

103. **Indecent Acts Through Abuse of Authority and Educational Relationship** – an offense under section 348(d)(1) of the Penal Law, carrying a maximum penalty of 4 years imprisonment.

a. Criminal act – it is required to prove that the perpetrator committed the following:

   i. An indecent act, defined in section 348(f) of the Penal Law as "*an act for the purpose of sexual arousal, satisfaction or abasement*"; Under Israeli law, any act could qualify as an indecent act, as long as it is committed for the purpose of sexual arousal, satisfaction or abasement.

   ii. Upon a minor who has reached the age of 14;

   iii. by exploiting relations of dependency, authority, education, supervision, work or service.

b. Criminal intent – this is a behavioral offense, and therefore the following must be proven:

   i. The perpetrator was aware of the nature of the physical act;

   ii. The perpetrator was aware of the aggravating circumstances of the criminal act, in this case that the victim is a minor who has reached the age of 14, and the existence of relations of dependency, authority, education, supervision, work or service.

   iii. The acts were committed with the intent to achieve sexual arousal, satisfaction or abasement.

104. **Indecent Act Against a Minor Under the age of 16 Without Consent –** an offense under section 348(b) of the Penal Law in the circumstances described in section 345(b)(1), carrying a maximum penalty of 10 years imprisonment.

a. Criminal act – it is required to prove that the perpetrator committed the following:

   i. An indecent act, defined in section 348(f) of the Penal Law as "*an act for the purpose of sexual arousal, satisfaction or abasement*"; Under Israeli law, any act could qualify as an

indecent act, as long as it is committed for the purpose of sexual arousal, satisfaction or abasement.

ii. Upon a minor under the age of 16;

iii. Without their consent.

b. Criminal intent – this is a behavioral offense, and therefore the following must be proven:

i. The perpetrator was aware of the nature of the physical act;

ii. The perpetrator was aware of the aggravating circumstances of the criminal act, in this case that the victim was a minor under the age of 16, and did not give his consent.

iii. The acts were committed with the intent to achieve sexual arousal, satisfaction or abasement.

**Prosecutor's Recommendation**

105. Farkash is suspected of committing serious sexual offenses upon minors, in the years 2020-2023, in violation of Israeli law.

106. The evidence described in this affidavit indicate that Farkash committed the abovementioned offenses against the minors Y.S and D.R.

107. In light of the above, upon Farkash's extradition to Israel and after his questioning by the police, an indictment will be filed in the Tel-Aviv District Court and he will be brought before the Israeli court to stand trial for Attempted Rape, Indecent Acts Through Abuse of Authority or Educational Relationship and Indecent Acts Against a Minor Under the age of 16 Without Consent.

**Conclusion**

108. In my opinion as an experienced prosecutor, the evidence described in this affidavit clearly shows culpability for the crimes for which Farkash's extradition is sought.
109. The above-stated evidence clearly provides a substantial evidentiary basis of criminal involvement in the crimes for which Farkash's extradition is requested.
110. Everything stated in this affidavit is true and correct to the best of my knowledge and belief, and is based upon the evidence in the police investigation file in this case.

Rosi Kabaz

**Certification**

I, the undersigned, Avi Kron, hereby certify that I am a member of the Israel Chamber of Advocates, and that I am an Attorney at the Israeli State Attorney's Office, and that in accordance with Section 15(b)(3) and 15(b)(4) of the Evidence Ordinance (New Version), 5731-1971, I am authorized to certify an affidavit so that it may be used as valid written evidence. I further certify that on the day of May 21, 2026 there appeared before me Rosi Kabz, who identified herself by her identity card No. [redacted], and after I warned her that she must declare the truth and if she does not do so, she will be liable to the penalties prescribed by law, she stated before me that everything set out in this affidavit is true to the best of her knowledge and belief, and signed it before me.

עו"ד אבי קרוננברג
מ.ר. 55921

Avi Kron, Adv.

**State of Israel**
Ministry of Justice
Office of the State Attorney
Department of International Affairs

**מדינת ישראל**
משרד המשפטים
פרקליטות המדינה
המחלקה הבינלאומית

# Supplementary Request for the Extradition
# Of
# Yechiel Yehoshua Farkash

1. In accordance with the Convention on Extradition between the Government of the State of Israel and the Government of the United States of America, and the Protocol between the Government of the State of Israel and the Government of the United States, the State of Israel hereby supplements its request for the extradition of Israeli and American national, **Yechiel Yehoshua Farkash** (hereinafter: "**Farkash")**, submitted to the United States authorities on June 2nd, 2026 (hereinafter: "**the Original Request**").

2. Farkash's extradition is requested so that he may stand trial in Israel on the charges of **Attempted Rape** under section 345(a)(1) together with section 25 of Israel's Penal Law 5737-1977 (hereinafter: **"the Penal Law"**); **Indecent Acts Through Abuse of Authority and Educational Relationship** under section 348(d)(1) of the Penal Law; and **Indecent Acts against a Minor Under the age of 16** under section 348(b) of the Penal Law in the circumstances described in section 345(b)(1).

3. The Original Request details the facts which underly the counts for each charge. In what follows, the specific counts will be described.

4. Farkash is alleged to have committed, on at least 17 occasions (counts) the offense of **Indecent Acts Through Abuse of Authority and Educational Relationship** against the victim Y.S (paragraphs 4-18 of the Original Request):

i. On multiple occasions, the exact number is unknown, Farkash hugged Y.S, from the front or from the back. On some occasions, he pressed his erect genitalia against Y.S's body.

ii. Farkash touched Y.S near his lower abdomen and his genitalia.

iii. Farkash hugged Y.S and pressed his genitalia against Y.S's body.

iv. Farkash called Y.S to his office, where he hugged him, pressed his genitalia against Y.S's body, touched his own genitalia and then touched Y.S's genitalia over his clothes.

v. Farkash sat Y.S on his lap, hugged him, soaped his body and touched his genitalia under his underwear.

vi. Farkash got in the hot tub with Y.S while they both were only in their underwear. Then, Farkash put Y.S's head on his genitalia. Subsequently, Farkash pressed his genitalia against Y.S's buttocks and between his legs, trying to achieve sexual release. Farkash kissed Y.S and touched his buttocks under his underwear. In light of Y.S's resistance, Farkash said that next time it would be easier, grabbed Y.S head and kissed him on the mouth.

vii. While Y.S showered, Farkash entered the shower and kissed Y.S.

viii. Farkash entered a hot tub with Y.S and touched Y.S' genitalia.

ix. on at least four different occasions, Farkash touched Y.S's genitalia – over and under his clothes.

x. While driving Y.S to the Yeshiva, Farkash touched his body.

xi. After attempting to rape Y.S, Farkash requested that Y.S. remove his underwear so that he could see his genitals, and Y.S did so.

xii. During the drive from the rental unit, Farkash touched Y.S, eventually stopping the vehicle in order to continue touching him, inserting his hand into Y.S's underwear, touching his buttocks, and kissing him on the mouth.

xiii. Farkash touched Y.S.'s body and genitals over his clothing. Farkash then returned Y.S to the boarding school, hugged him, and left.

**State of Israel**
Ministry of Justice
Office of the State Attorney
Department of International Affairs

**מדינת ישראל**
משרד המשפטים
פרקליטות המדינה
המחלקה הבינלאומית

xiv. Farkash forcibly grabbed Y.S. by the jaw and kissed him on the mouth, and touched his genitals over his clothing.

5. The abovementioned acts were committed for the purpose of sexual arousal, gratification or degradation.

6. Furthermore, Farkash is alleged to have committed, on 1 occasion (count), the offense of **Attempted Rape** against the victim Y.S (paragraph 15 of the Original Request):

   i. While both were on the bed, Farkash inserted his penis through Y.S's boxer briefs, rubbed it against his buttocks and attempted to penetrate his anus. Y.S. resisted these actions, causing Farkash to become angry. He then forcibly grabbed Y.S, shook him, and repeatedly attempted to penetrate his anus. Despite Farkash changing their body positions periodically and making persistent attempts to - achieve anal penetration, the minor Y.S. continued to resist these actions. At some point during the incident, Farkash – while wearing boxer briefs – pressed his lower body and his penis against Y.S's mouth, and subsequently took Y.S's hand and placed it on his penis.

7. In addition, Farkash is alleged to have committed, on at least 4 occasions (counts) the offense of **Indecent Acts against a Minor Under the age of 16** against the victim D.R. (paragraphs 19-26 of the Original Request):

   i. Farkash reached out and stroked D.R’s leg, moving along the leg up to his groin, for the purpose of sexual gratification and arousal, while repeatedly telling D.R that he loved him.

   ii. Farkash approached D.R, stroked his neck and told him he loved him.

   iii. While walking between stores, Farkash stroked D.R's neck and placed his hand on his abdomen.

   iv. On their way back from a restaurant Farkash continued to place his hand on D.R's body.

**State of Israel**
Ministry of Justice
Office of the State Attorney
Department of International Affairs

**מדינת ישראל**
משרד המשפטים
פרקליטות המדינה
המחלקה הבינלאומית

8. The abovementioned acts were committed for the purpose of sexual arousal, gratification or degradation.

9. The State of Israel will submit any additional information that the United States authorities may require in order to enable it to proceed with Farkash's extradition.

10. This Supplementary Request, is hereby authenticated by the official seal of the Ministry of Justice of the State of Israel.

Jerusalem, 5 day of June, 2026

20 day of Sivan, 5786

Shelley Zeevi-Barzilai

Shelley Ze`evi-Barzilai
Director
Department of International Affairs
Office of the State Attorney
Ministry of Justice
State of Israel